IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| **UNITED CONSUMERS CLUB, INC.** | : | Case No. 2:07 CV 358 |
| **and DIRECTBUY, INC.,** | : | |
| | : | Judge Joseph Van Bokkelen |
| Plaintiffs, | : | |
| | : | Magistrate Judge Andrew Rodovich |
| v. | : | |
| | : | |
| **PRIME TIME MARKETING** | : | |
| **MANAGEMENT, INC., DELL** | : | |
| **CRAAYBEEK, and BRENDA** | : | |
| **CRAAYBEEK,** | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

---

## DEFENDANTS' ANSWER AND COUNTERCLAIMS

---

## ANSWER

Defendants answer the allegations set forth in Plaintiff's complaint as follows:

## FIRST DEFENSE

With respect to the specific allegations of the numbered paragraphs of the complaint,

Defendants admit, deny and allege as follows:

1.     Plaintiff's allegations contained in paragraph 1 call for a legal conclusion and,

therefore, Defendants deny said allegations in their entirety.

2.     Defendants are without knowledge or information sufficient to form a belief as to

the allegations contained in paragraph 2 and, therefore, Defendants deny said

allegations in their entirety.

3.      Defendants are without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 3 and, therefore, Defendants deny said allegations in their entirety.

4.      Defendants admit that the Craaybeeks are residents and citizens of the State of Ohio. Defendants admit that Dell Craaybeek is a principal of Home Improvement Design Gallery. Defendants deny the remaining allegations of paragraph 3.

5.      Defendants admit paragraph 5.

6.      Plaintiff's allegations contained in paragraph 6 call for a legal conclusion and, therefore, Defendants deny said allegations in their entirety.

7.      Defendants admit that this Court has jurisdiction in accordance with U.S.C. §§ 1331, 1332, 1338, and 1367.  Defendants further admit that they are citizens of different states.  Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations contained in paragraph 7 and, therefore, Defendants deny said allegations.

8.      Defendants deny paragraph 8 in its entirety.  Specifically, none of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. Moreover, the franchise agreement merely provides that Plaintiff "may" bring an action in any state or federal court sitting in Lake County, Indiana.

9.      Defendants are without knowledge or information sufficient to form a belief as to the first sentence of paragraph 9 and, therefore, Defendants deny said allegation. Defendants deny that the products offered by DirectBuy are exclusively available

2

to DirectBuy members.

10.     Defendants are without knowledge or information sufficient to form a belief as to paragraph 10 and, therefore, Defendants deny said allegations.

11.     Defendants are without knowledge or information sufficient to form a belief as to paragraph 11 and, therefore, Defendants deny said allegations.

12.     Defendants are without knowledge or information sufficient to form a belief as to paragraph 12 and, therefore, Defendants deny said allegations.

13.     Defendants are without knowledge or information sufficient to form a belief as to paragraph 13 and, therefore, Defendants deny said allegations.

14.     Defendants are without knowledge or information sufficient to form a belief as to paragraph 14 and, therefore, Defendants deny said allegations.

15.     Defendants are without knowledge or information sufficient to form a belief as to paragraph 15 and, therefore, Defendants deny said allegations.

16.     Defendants admit the first sentence of paragraph 16.  Defendants are without knowledge or information sufficient to form a belief as to the final sentence of paragraph 16 and, therefore, Defendants deny said allegation.

17.     Defendants admit paragraph 17.

18.     Exhibit "C" referenced in paragraph 18 speaks for itself and must be read as a whole. Defendants therefore deny the allegations contained in paragraph 18.

19.     Exhibit "D" referenced in paragraph 19 speaks for itself and must be read as a

whole. Defendants therefore deny the allegations contained in paragraph 19.

20.     Exhibit "E" referenced in paragraph 20 speaks for itself and must be read as a whole.  Defendants therefore deny the first sentence of paragraph 20.  Exhibit "F" referenced in paragraph 20 speaks for itself and must be read as a whole. Defendants therefore deny the second sentence of paragraph 20.  Defendants further deny the second sentence of paragraph 20 to the extent that Plaintiff could not unilaterally extend the franchise agreement.

21.     The franchise agreement attached as Exhibit "A" speaks for itself and must be read as a whole.  Defendants therefore deny the allegations contained in paragraph 21.

22.     The franchise agreement attached as Exhibit "A" speaks for itself and must be read as a whole.  Defendants therefore deny the allegations contained in paragraph 22.

23.     The franchise agreement attached as Exhibit "A" speaks for itself and must be read as a whole.  Defendants therefore deny the allegations contained in paragraph 23.

24.     Defendants admit that Plaintiff served Prime Time with a letter on May 11, 2007. Defendants deny the remaining allegations of paragraph 24.  Specifically, Exhibit "G" speaks for itself and must be read as a whole.

25.     Defendants deny paragraph 25.

26.     Defendants deny paragraph 26 because they promptly fulfilled each post-

termination obligation Plaintiff demanded of them.  DirectBuy expressly

requested that Prime Time identify itself as a former DirectBuy business and use

DirectBuy materials, forms and supplies in order to service members post-

termination.  Shortly after DirectBuy informed Prime Time that it need no longer

service members, Prime Time ceased to identify itself as a DirectBuy business.

Defendants admit that they did not immediately make efforts to transfer telephone

numbers to Plaintiff because DirectBuy expressly requested that Prime Time

continue servicing Dayton members which required Defendants to use the

telephone numbers.   DirectBuy never requested that Prime Time stop using the

telephone numbers before DirectBuy filed its Indiana lawsuit.  At any rate, the

franchise agreement authorized Plaintiff to transfer the numbers as Prime Time's

attorney in fact.

27.     Defendants deny the first allegation contained in paragraph 27 because

Defendants made arrangements to transfer the numbers to Plaintiff promptly after

Plaintiff expressed an interest in the taking over the numbers.  Defendants admit

that they did not immediately make efforts to transfer telephone numbers to

Plaintiff because DirectBuy expressly requested that Prime Time continue

servicing Dayton members which required Defendants to use the telephone

numbers.   DirectBuy never requested that Prime Time stop using the telephone

numbers before DirectBuy filed its Indiana lawsuit.  At any rate, the franchise

agreement authorized Plaintiff to transfer the numbers as Prime Time's attorney in

fact. As for the second allegation, Defendants deny any allegation that they "made

5

arrangements" to "divert" calls made to the former DirectBuy center.  As for the third allegation, Defendants deny that there are any links from the former DirectBuy center to Defendants' business Home Improvement Design Gallery. Defendants deny the final allegation.

28. Defendants deny the first sentence of paragraph 28.  Plaintiff requested that Defendants not operate said business, and Defendants promptly  complied.

29. Defendants deny paragraph 29.

30. Defendants deny paragraph 30 to the extent that Plaintiff contends they continue to use the DirectBuy mark.  Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations of paragraph 30 and, therefore, Defendants deny said allegations.

31. Defendants deny paragraph 31 to the extent that Plaintiff contends that they continue to use the DirectBuy mark.  Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations of paragraph 31 and, therefore, Defendants deny said allegations.

32. Defendants deny paragraph 32.

33. Defendants repeat and reallege paragraphs 1 through 33 of their Answer as and for this paragraph 33, as if fully set forth herein.

34. Plaintiff's allegations contained in paragraph 34 call for a legal conclusion and, therefore, Defendants deny said allegations in their entirety.

35. Defendants deny paragraph 35.

36.     Defendants deny paragraph 36 to the extent Plaintiff contends Defendants caused damage or otherwise engaged in misconduct.  Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations of paragraph 36 and, therefore, Defendants deny said allegations.  Furthermore, Defendants deny paragraph 36 to the extent it calls for a legal conclusion.

37.     Defendants deny paragraph 37.

38.     Defendants repeat and reallege paragraphs 1 through 37 of their Answer as and for this paragraph 38, as if fully set forth herein.

39.     Defendants deny paragraph 39 to the extent Plaintiff contends they engaged in unfair competition.  Defendants further deny this paragraph because they are without knowledge or information sufficient to form a belief thereof, and because it calls for a legal conclusion.

40.     Defendants deny paragraph 40 to the extent Plaintiff contends they engaged in unfair competition.  Defendants further deny this paragraph because they are without knowledge or information sufficient to form a belief thereof, and because it calls for a legal conclusion.

41.     Defendants deny paragraph 41 to the extent Plaintiff contends Defendants caused damage or otherwise engaged in misconduct.  Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations of paragraph 36 and, therefore, Defendants deny said allegations.  Furthermore, Defendants deny paragraph 36 to the extent it calls for a legal conclusion.

42.     Defendants deny paragraph 42.

43.     Defendants repeat and reallege paragraphs 1 through 42 of their Answer as and for this paragraph 43, as if fully set forth herein.

44.     Defendants deny paragraph 44 because they promptly fulfilled each post-termination obligation Plaintiff demanded of them.  DirectBuy expressly requested that Prime Time identify itself as a former DirectBuy business and use DirectBuy materials, forms and supplies in order to service members post-termination.  Shortly after DirectBuy informed Prime Time that it need no longer service members, Prime Time ceased to identify itself as a DirectBuy business. Defendants admit that they did not immediately make efforts to transfer telephone numbers to Plaintiff because DirectBuy expressly requested that Prime Time continue servicing Dayton members which required Defendants to use the telephone numbers.   DirectBuy never requested that Prime Time stop using the telephone numbers before DirectBuy filed its Indiana lawsuit.  At any rate, the franchise agreement authorized Plaintiff to transfer the numbers as Prime Time's attorney in fact.

45.     Defendants deny paragraph 45.

46.     Defendants deny paragraph 46.

47.     Defendants deny paragraph 47.

48.     Defendants deny paragraph 48.

49.     Defendants repeat and reallege paragraphs 1 through 48 of their Answer as and for

this paragraph 49, as if fully set forth herein.

50.     Defendants admit that members pay a fee to join DirectBuy centers.  Defendants

deny that the savings are always tremendous and allege that manufacturers

frequently offer superior products at lower prices than offered by DirectBuy.

Defendants are without knowledge or information sufficient to form a belief as to

the remaining allegations of paragraph 50 and, therefore, Defendants deny said

allegations.

51.     Defendants admit the first sentence of paragraph 51.  Defendants deny the

remaining allegation.

52.     Defendants are without knowledge or information sufficient to form a belief as to

the first sentence of paragraph 52.   Defendants are without knowledge or

information sufficient to form a belief as to the second sentence of paragraph 52

and, therefore, deny said allegation.   Defendants deny the third sentence of

paragraph 52.  Defendants deny the fourth sentence of paragraph 52.

53.     Defendants deny the first sentence of paragraph 53.  Defendants deny the second

sentence of paragraph 53.  Defendants are without knowledge or information

sufficient to form a belief as to the third sentence of paragraph 52 and, therefore,

deny the allegation.

54.     Defendants deny the first sentence of paragraph 54, in that they did not unjustly

enrich themselves through secret and unlawful markups.  Defendants deny the

second sentence of paragraph 54 because they did not flatly refuse to disgorge the

9

so-called member overcharges.  Defendants deny the third sentence of paragraph 54.

## SECOND DEFENSE

Defendants deny each and every allegation not specifically admitted in the First Defense of this Answer.

## THIRD DEFENSE

Plaintiff's Complaint should be stricken because each paragraph is not limited to a single set of circumstances in accordance with Fed.R. 10(b).

## FOURTH DEFENSE

The complaint fails to state a claim upon which relief can be granted.

## FIFTH DEFENSE

Venue is improper.

## SIXTH DEFENSE

Plaintiff's claims are barred by the doctrines of acquiescence, waiver, estoppel and ratification.

## SEVENTH DEFENSE

Plaintiff's claims are barred by the doctrines of unclean hands and *in pari delicto*.

## EIGHTH DEFENSE

Plaintiff's claims are barred by contributory and comparative negligence.

## NINTH DEFENSE

Plaintiff's claims are barred or must be reduced by Plaintiff's failure to mitigate damages.

## TENTH DEFENSE

Plaintiff's claims are barred or must be reduced by recoupment and set-off.

## ELEVENTH DEFENSE

Plaintiff's complaint fails to name indispensable parties as required by Fed.R. 19 and accordingly must be dismissed.

## TWELFTH DEFENSE

Any damages sustained by Plaintiff was caused by intervening and/or superseding actions of third parties over whom Defendants have no control.

## THIRTEENTH DEFENSE

Defendants acted in good faith at all times relevant to Plaintiff's complaint.

## FOURTEENTH DEFENSE

Defendants reserve the right to include additional defenses after discovery proceeds in this case.

WHEREFORE, having fully answered the Complaint in the above-captioned matter, Defendants respectfully request that Plaintiff take nothing by reason of the Complaint and action, that the action and Complaint be dismissed with prejudice, and the Defendants recover costs and attorneys' fees and such other relief as the Court may deem appropriate.

## COUNTERCLAIMS

For its counterclaims against DirectBuy, Prime Time and the Craaybeeks allege as follows:

### JURISDICTION AND VENUE

1.      On September 11, 2007, Prime Time and the Craaybeeks filed a lawsuit against DirectBuy in the Montgomery County Ohio Court of Common Pleas.

11

2.      This Court retained jurisdiction and venue by virtue of DirectBuy's "Notice of

Removal," filed on October 12, 2007.

3.      Prime Time is an Ohio business corporation, which at all relevant times did

business in Montgomery County, Ohio.

4.      DirectBuy is an Indiana business corporation, which at all relevant times did

business in Montgomery County, Ohio.

<u>BACKGROUND FACTS</u>

5.      On or about November 17, 1986, DirectBuy, Inc. ("DirectBuy"), as the franchisor,

entered into a written franchise agreement with D.D.O. Management, Inc.

("D.D.O. Management"), as the franchisee. A true and accurate copy of the

franchise agreement is attached as Exhibit "A" to Plaintiff's Complaint.

6.      The franchise agreement authorized D.D.O. Management to operate a DirectBuy

members-only buying club ("club") in Dayton, Ohio, for a twenty-year term,

expiring on November 17, 2006.

7.      In April 1992, D.D.O. Management assigned to Prime Time its rights, title and

interest under the franchise agreement, upon DirectBuy's approval.  Attached as

Exhibit "B" is a true and accurate copy of the assignment.

8.      Dell Craaybeek is the sole owner of Prime Time.

9.      Under the franchise agreement, Prime Time sold memberships to its club, for

which DirectBuy received "royalty fees."

10.     Prime Time's members ordered merchandise and services through vendors at

discounted prices, for which DirectBuy received a "service fee."

11.     DirectBuy negotiated with approximately seven hundred (700) national vendors from which Prime Time's members could order merchandise.

12.     In addition to national vendors available through DirectBuy, each DirectBuy franchisee has the option of establishing additional supplier relationships with local vendors, thereby enhancing the extent of members' product selection and purchasing options.

13.     DirectBuy benefitted when members ordered merchandise through the national vendors because it received substantial perks and kickbacks, unbeknownst to DirectBuy members.  For instance, some of the national vendors selected by DirectBuy secretly charged DirectBuy members a higher price than it charged other wholesalers, such as furniture and department stores.  Each month, the national vendors remitted to DirectBuy a portion of the excess amount paid by DirectBuy members as an incentive for DirectBuy to encourage its members to purchase from the national vendors (e.g. some national vendors would charge DirectBuy members $100.00 for a table, while it only charged other wholesalers $90.00 for the same table, and it would secretly send DirectBuy some or all of the $10.00 excess paid by the DirectBuy member).

14.     The national vendors selected by DirectBuy did not always provide quality products in a timely manner, forcing Prime Time to make arrangements with more reliable local vendors.

15.     As a result of increasing on-line complaints made by DirectBuy members regarding the lack of quality products and/or untimely service provided by the

13

national vendors selected by DirectBuy, DirectBuy paid internet specialists to "bury" complaints by, for instance, linking an array of negative metatags with innocuous DirectBuy webpages.  As a result, potential members and dissatisfied members are less likely to find on-line complaints regarding DirectBuy.

16.     With DirectBuy's knowledge and tacit consent, Prime Time placed orders with local vendors who were able to meet members' needs by supplying quality merchandise in a timely manner at prices competitive, if not lower, than those charged by the national vendors selected by DirectBuy, from whom DirectBuy received perks and kickbacks.

17.     The service and prices offered by the local vendors provided Prime Time's members with greater satisfaction.

18.     Prime Time's commitment to providing its members with superior service and pricing resulting it its becoming one of DirectBuy's top revenue producing franchisees in the nation.

19.     Prime Time's high level of business and member satisfaction using a network of local vendors resulted in a large and highly valuable member base and substantial goodwill in the Dayton area.

20.     DirectBuy pushed members who required financing to pay for membership fees and merchandise, to finance such transactions through their wholly owned subsidiary, Beta Finance, for which DirectBuy received substantial "financing and interest fees."

21.     Prime Time placed monies it received from its members into a "Merchandise

14

Account," as set forth in the franchise agreement.

22. DirectBuy regularly conducted a "sweep" of the Merchandise Account, taking its share of fees from said account and then remitting Prime Time's portion of said funds.

23. DirectBuy required Prime Time to lease suitable premises for the operation of the club.

24. Prime Time obtained suitable premises for the operation of the club, owned by the Craaybeeks, located at 8970 Kingsridge Drive, Dayton, Ohio.

25. DirectBuy required Prime Time to hire and train employees per its standards.

26. Prime Time hired and trained employees to work at the club, at great expense.

27. On February, 14, 2005, the parties amended the franchise agreement through a "Handling Fee Amendment." Attached as Exhibit "C" is a true and accurate copy of the Handling Fee Amendment.

28. The Handling Fee Amendment permitted Prime Time to charge a handling fee of not more than "8% of the actual cost of purchasing merchandise for [Prime Time's] members."

29. The Handling Fee Amendment did not define "actual costs," and expressly provided that DirectBuy "shall have no liability, directly or indirectly, in connection with [Prime Time's] increase in handling fees."

30. On November 13, 2006, DirectBuy and Prime Time extended the franchise agreement until February 17, 2007. Attached as Exhibit "D" is a true and accurate copy of the document extending the franchise agreement.

31.     The parties did not bilaterally enter into any further extensions.

32.     Sections 18(B) and 18(H) of the franchise agreement required written agreement by DirectBuy and Prime Time to extend the agreement.

33.     After DirectBuy allowed the franchise agreement to expire, DirectBuy suddenly and without warning terminated its relationship with Prime Time.

34.     DirectBuy's conduct was malicious, made with intent to harm Prime Time by confiscating Prime Time's goodwill, including but not limited to its member rights and the fees those members generated, and/or was in reckless disregard of Prime Time's rights.

35.     Soon after DirectBuy's sudden and unexpected termination of the business relationship, DirectBuy instructed Prime Time to continue servicing Prime Time's former members.

36.     The parties continued their business relationship after the expiration of the extended franchise agreement without formally entering into a new agreement.

37.     DirectBuy benefitted from the continued business relationship, considering Prime Time was one of the highest grossing DirectBuy franchisees in the country.

38.     On May 11, 2007, DirectBuy terminated the business relationship, claiming, in pertinent part, that Prime Time violated the expired Amendment by allegedly overcharging its members.

39.     Months later, DirectBuy asserted, without providing any documentation, that the so-called overcharges total $789,351.52.

40.     Prime Time requested substantiation of DirectBuy's calculations, and DirectBuy

16

ignored Prime Time's request.

41.    In the interest of compromise, Prime Time agreed to place funds into escrow from which it would pay any members who later claimed to have overpaid Prime Time, and DirectBuy ignored Prime Time's proposal.

42.    DirectBuy instructed Prime Time to return all DirectBuy's merchandise, advertising materials, forms, and stationery supplies displaying the DirectBuy mark, and, at great expense, Prime Time promptly complied.

43.    DirectBuy instructed Prime Time to terminate certain employees of Prime Time so that DirectBuy could hire Prime Time's local, experienced employees to service the Dayton members, and Prime Time promptly complied.

44.    Prime Time expended more than $120,000 servicing its former members as requested by DirectBuy, for which DirectBuy benefitted and did not compensate Prime Time.

45.    It would be unjust for DirectBuy to retain the benefit from Prime Time's services without compensating Prime Time.

46.    DirectBuy owes Prime Time monies it has collected in excess of the fees to which it is entitled under the franchise agreement.

47.    DirectBuy has refused to pay Prime Time said monies.

48.    It would be unjust for DirectBuy to retain said monies at Prime Time's expense.

49.    The expired franchise agreement does not permit DirectBuy to offset any payments received from Prime Time, or any indebtedness of DirectBuy to Prime Time, to any alleged indebtedness owed to Prime Time's former members.

17

50.   After terminating the business relationship, DirectBuy took control of Prime Time's members, from which it directly benefitted, without compensating Prime Time.

51.   Prime Time spent a considerable amount of time and money amassing its large member base of more than three thousand (3,000) people.

52.   It would be unjust for DirectBuy to retain any benefits from Prime Time's former members without compensating Prime Time, considering Prime Time spent a great deal of time and money amassing its former members.

53.   Under the franchise agreement, DirectBuy had an "option to purchase any and all rights" of Prime Time accruing within thirty days of the effective date of termination "under membership agreements for membership in the CLUB in effect as of the Option Exercise Date."  *See* Exhibit "A" to Complaint, at Section 16(G).

54.   Rather than exercise its option to purchase Prime Time's membership rights, DirectBuy, in bad faith, confiscated Prime Time's membership rights and goodwill without compensating Prime Time.

55.   After the termination, DirectBuy left its property at Prime Time's leased premises without compensating Prime Time.

56.   DirectBuy used Prime Time's leased premises to conduct business without compensating Prime Time.

57.   It would be unjust for DirectBuy to retain any benefit from using Prime Time's leased premises without compensating Prime Time.

18

58.   After the termination, DirectBuy agreed to pay the Craaybeeks in connection with DirectBuy's continued use of the Craaybeeks' building.

59.   DirectBuy failed and refused to pay the Craaybeeks for its use of their building.

60.   Prime Time relied upon DirectBuy to take its share of fees and, then, remit to Prime Time its share of the funds.

61.   Prime Time threatened to file suit if DirectBuy would not give Prime Time the funds improperly held by DirectBuy.

62.   DirectBuy informed its other franchisees that Prime Time "is cooperating fully in making the wind-down of operations as seamless as possible for the members," yet it filed a lawsuit in the Northern District of Indiana once month after Prime Time had filed suit in Ohio state court on September 11, 2007.

<u>COUNT ONE</u>

63.   Prime Time fully incorporates by reference all previous paragraphs as if stated fully herein.

64.   DirectBuy breached section 16(G) of the franchise agreement by failing to purchase Prime Time's rights in all memberships in effect as of May 11, 2007.

65.   DirectBuy owes Prime Time in excess of $25,000 for the misconduct described herein.

<u>COUNT TWO</u>

66.   Prime Time fully incorporates by reference all previous paragraphs as if stated fully herein.

67.   DirectBuy breached section 8 of the franchise agreement by refusing to return

19

funds to Prime Time to which DirectBuy is not entitled.

68.   DirectBuy owes Prime Time in excess of $25,000 for the misconduct described

herein.

## COUNT THREE

69.   Prime Time fully incorporates by reference all previous paragraphs as if stated

fully herein.

70.   DirectBuy is wrongfully withholding funds which belong to Prime Time.

71.   Said funds are traceable, and they were kept in an account earmarked for Prime

Time.

72.   Prime Time demanded the return of said funds.

73.   DirectBuy maliciously refused to return said funds.

74.   DirectBuy owes Prime Time in excess of $25,000, including but not limited to

attorney's fees and costs, for the misconduct described herein.

## COUNT FOUR

75.   Prime Time fully incorporates by reference all previous paragraphs as if stated

fully herein.

76.   DirectBuy requested to use Prime Time's leased premises to service Dayton

members, promising to compensate Prime Time for its use.

77.   Prime Time allowed DirectBuy to use its leased premises to service Dayton

members.

20

78.   Prime Time demanded compensation for DirectBuy's use of its leased premises.

79.   DirectBuy, in bad faith, refused to pay for its use of Prime Time's leased premises.

80.   DirectBuy owes Prime Time in excess of $25,000, including but not limited to attorney's fees and costs, for the misconduct described herein.

<u>COUNT FIVE</u>

81.   Prime Time fully incorporates by reference all previous paragraphs as if stated fully herein.

82.   After May 11, 2007, DirectBuy represented, through telephone conversations and e-mails, to Prime Time that it would compensate Prime Time for its use of Prime Time's employees and leased premises.

83.   After May 11, 2007, DirectBuy represented, through telephone conversations and e-mails, that it would assume Prime Time's lease or otherwise enter into a lease with Prime Time's lessor.

84.   DirectBuy did not compensate Prime Time for its use of Prime Time's employees, use of Prime Time's leased premises, assume Prime Time's lease or otherwise enter into a lease with Prime Time's lessor.

85.   DirectBuy's representations were material, as Prime Time would not have permitted DirectBuy to use its employees and leased premises absent the representations.

86.   DirectBuy made the representations with knowledge of their falsity, or with utter disregard and recklessness as to their falsity.

87.    DirectBuy made the representations with the intent to mislead Prime Time.

88.    Prime Time justifiably relied upon DirectBuy's representations.

89.    Prime Time was injured as a result of DirectBuy's representations, as it paid its employees, spent time servicing Dayton members and paid its rent and utilities.

90.    DirectBuy's misrepresentations were made with malice and/or utter disregard to harm Prime Time.

91.    DirectBuy owes Prime Time in excess of $25,000, including but not limited to attorney's fees, costs and punitive damages, for the misconduct described herein.

<u>COUNT SIX</u>

92.    Prime Time fully incorporates by reference all previous paragraphs as if stated fully herein.

93.    Prime Time and its members had a business relationship.

94.    DirectBuy knew of the business relationships.

95.    DirectBuy intentionally interfered with Prime Time's business relationships causing a termination thereof.

96.    As a result of DirectBuy's interference, Prime Time sustained substantial damages, including but not limited to the termination of business relationships Prime Time had with its more than 3,000 members.

97.    DirectBuy's conduct lacked justification or privilege, as the franchise agreement required DirectBuy to purchase Prime Time's rights to the memberships.

98.    DirectBuy owes Prime Time in excess of $25,000, for the misconduct described

herein.

COUNT SEVEN

99.  Prime Time fully incorporates by reference all previous paragraphs as if stated fully herein.

100.  After the franchise agreement expired, Prime Time and DirectBuy continued to engage in a business relationship.

101.  Prime Time continued offering services to its members, from which DirectBuy benefitted.

102.  It was implied that the parties would continue the relationship in accordance with the terms of the franchise agreement.

103.  DirectBuy has not compensated Prime Time in accordance with the franchise agreement.

104.  DirectBuy must compensate Prime Time in excess of $25,000, for their misconduct described herein.

COUNT EIGHT

105.  The Craaybeeks fully incorporate by reference all previous paragraphs as if stated fully herein.

106.  As of May 11, 2007, DirectBuy expressed a desire to use the Craaybeeks' building in Dayton, as a service center.

107.  DirectBuy agreed to compensate the Craaybeeks for such use.

108.  DirectBuy used the Craaybeeks' building, but, in bad faith, failed to compensate

23

the Craaybeeks for such use.

109.   DirectBuy must compensate the Craaybeeks in excess of $25,000, including but not limited to attorneys' fees and costs, for the misconduct described herein.


COUNT NINE

110.   Prime Time fully incorporates by reference all previous paragraphs as if stated fully herein.

111.   Prime Time bestowed a benefit to DirectBuy by providing its leased premises, employees, services, access to its members, members list, and goodwill, in addition to other benefits.

112.   DirectBuy knew of such benefits.

113.   Prime Time expended a considerable amount of time and money bestowing the benefits upon DirectBuy.

114.   It would be unjust for DirectBuy to retain said benefits without compensating Prime Time.

115.   DirectBuy owes Prime Time in excess of $25,000, for the misconduct described herein.

COUNT TEN

116.   The Craaybeeks fully incorporate by reference all previous paragraphs as if stated fully herein.

117.   Upon DirectBuy's request, the Craaybeeks bestowed a benefit to DirectBuy by

providing its premises for DirectBuy's benefit.

118.   DirectBuy knew of such benefit.

119.   The Craaybeeks could not receive income for their premises while DirectBuy used the premises as DirectBuy's service center.

120.   It would be unjust for DirectBuy to retain said benefits without compensating the Craaybeeks.

121.   DirectBuy owes the Craaybeeks in excess of $25,000, for the misconduct described herein.

<u>COUNT ELEVEN</u>

122.   Prime Time fully incorporates by reference all previous paragraphs as if stated fully herein.

123.   DirectBuy terminated the franchise agreement because Prime Time purportedly violated the Handling Fee Amendment by allegedly overcharging its members, among other alleged violations of the franchise agreement.

124.   DirectBuy demanded that Prime Time pay the so-called overcharges directly to DirectBuy.

125.   The Handling Fee Amendment expressly disclaims all liability on the part of DirectBuy in connection with Prime Time's increase in handling fees.

126.   The franchise agreement does not permit DirectBuy offset Prime Time's monies against monies allegedly owed to members of Prime Time's franchisee.

127.   DirectBuy demanded that Prime Time pay DirectBuy more than $750,000 in

purported overcharges allegedly paid by Prime Time's former members.

128.    Prime Time requests this Court enter a declaratory judgment that Prime Time is not required to pay any alleged overcharges to DirectBuy.

WHEREFORE, Prime Time and the Craaybeeks request the following:

(1)    This Court enter a judgment in favor of Prime Time and/or the Craaybeeks, requiring DirectBuy to pay in excess of $25,000, including but not limited to attorney's fees and costs, in connection with Counts One through Ten

(3)    This Court enter a declaratory judgment that Prime Time is not required to pay any alleged overcharges to DirectBuy in connection with Count Eleven.

(4)    Any other relief this Court deems equitable and just, including but not limited to costs, attorney's fees, and punitive damages.

## JURY DEMAND

Prime Time requests this matter be tried by a jury.

Respectfully submitted,

Craig T. Matthews and Associates,
*A Legal Professional Association*


/s/ Craig Matthews
Craig T. Matthews (#0029215)
Attorney for Plaintiffs
320 Regency Ridge Drive
Centerville, Ohio 45459
Telephone: (937) 434-9393
Facsimile: (937) 434-9398
E-mail: cmatthews@ctmlaw.com


## <u>CERTIFICATE OF SERVICE</u>

I, Craig T. Matthews, hereby certify that on November 13, 2007, I electronically filed the foregoing using the ECF filing system, and that I served a copy to Joe Yast, Attorney for DirectBuy, at <u>JoeYastLaw@comcast.net.</u>


/s/ Craig Matthews
Craig T. Matthews (#0029215)
Attorney for Defendants