UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED CONSUMERS CLUB, INC., ) | |
| and DIRECTBUY, INC. ) | |
| ) | Cause No. 2:07-CV-358 JVB |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| PRIME TIME MARKETING ) | |
| MANAGEMENT, INC., HOME ) | |
| IMPROVEMENT WHOLESALE ) | |
| DISTRIBUTORS, INC., HOME STORAGE ) | |
| GROUP, INC., DELL CRAAYBEEK, ) | |
| AND BRENDA CRAAYBEEK, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Presently before the court are two Motions to Dismiss for Lack of Personal Jurisdiction; one filed by Defendant Home Improvement Wholesale Distributors ("HIWD")[1] (DE 131) and the other filed by Defendant Home Storage Group, Inc. ("HSG") (DE 129). For the following reasons, both HIWD and HSG's motions will be DENIED.

**FACTUAL BACKGROUND**

This is a classic business dispute alleging violations of the Lanham Act, 15 U.S.C. §1051, et seq., trademark infringement, unfair competition, misappropriation of trade secrets,

---

[1]In its original and amended complaints, Plaintiffs erroneously named the Defendant as "Home Improvement Warehouse Design, Inc." In its briefing, the Defendant makes much of this mistake. However, since the mistake was brought to the Plaintiffs' attention, they have amended their complaint for the second time thereby naming the proper party which the court has designated above as "Home Improvement Wholesale Distributors."

1

and tortious interference with contract. Plaintiffs seek injunctive relief as well as monetary damages against the defendants.

Believing that they were wrongly haled into court in Indiana, Defendants HIWD and HSG filed the present motions to dismiss contending that there are insufficient contacts with Indiana for them to be subject to suit here. After a brief review of the relevant facts, the court turns to these assertions.

**I.     General Background**

Plaintiff DirectBuy is a national member-only buying club that has been in existence for over 35 years. DirectBuy franchises to others to operate local DirectBuy members-only buying clubs at approximately 150 locations in 33 states across the United States and six provinces in Canada. Defendant Prime Time is a corporation organized under Ohio law with its principal place of business in Montgomery County, Ohio. Prime Time, as the facts will bear out, is a former franchisee of DirectBuy and operated a franchise center in Dayton, Ohio. Defendant Dell Craaybeek is domiciled in Ohio and is the President and sole shareholder of Prime Time. Defendants HIWD and HSG are both Ohio corporations with principal places of business in Montgomery County, Ohio.

**A.     The DirectBuy Business Model**

DirectBuy buying clubs offer a wide range of home furnishings and home improvement products exclusively to DirectBuy members including furniture, flooring, carpeting, cabinetry, window treatments, appliances, and lighting and home decor. In turn, members pay a fee to join

a franchise or company-owned DirectBuy buying club to have access to these products without paying traditional retail markup on them. To meet this promise made to members, they are informed that the goods they buy will be offered to them at a price equal to the cost paid by the DirectBuy club, plus shipping and/or a small agreed-upon handling fee charged by a franchisee.

DirectBuy owns a federally registered trademark DIRECTBUY ("the DirectBuy Mark") under which DirectBuy operates a members-only consumer buying club organization. The DirectBuy Mark was introduced in the spring of 2002 and it has been extensively used and promoted during this time. One of the primary means of promoting the DirectBuy Mark has been its national advertising through 30-minute infomercials.[2] The DirectBuy Mark is also promoted via a website accessible on the internet and via the worldwide web. For prospective members, the website also allowed persons to learn more about the DirectBuy business model and provided them an opportunity to get information about DirectBuy. The website also permits members to review merchandise available
for sale.

**B.      Prime Time's Franchise Agreement**

In 1992, through an assignment of an existing franchise agreement, Defendant Prime Time (a non-party to the current motions) began operation of the Dayton DirectBuy franchise club ("the Dayton Club"). Prime Time's franchised territory covered the geographic area in and around Dayton, Ohio and included Montgomery County, Ohio, Greene County, Ohio, and the

---

[2]The infomercials air on major television networks and independent television stations in major media markets, including ABC, CBS, NBC, Fox, and UPN. Many of the infomercials are also aired on so-called "superstations," which can be seen via satellite and cable in virtually all states and provinces.

northern portion of Warren County, Ohio.  Occasionally, Prime Time accepted members from cities in eastern Indiana, allegedly at the request of DirectBuy.  Prime Time's franchise agreement was terminated in May 2007.

When Prime Time was a franchisee, DirectBuy's national advertising highlighted to members the promise, noted above, that members would obtain goods at the DirectBuy club's cost without hidden retail markup.  As a result of the national promotion and advertising campaigns (which include the area within Prime Time's franchise agreement), members are repeatedly told that by joining DirectBuy or one of its franchises, members will receive tremendous savings and, according to DirectBuy, this is the "fundamental reason on which people  rely in deciding to join DirectBuy.  There is also website access available to members of the Prime Time franchise wherein the members may log-in and view the merchandise available at the Dayton Club showroom and be directed to the showroom address to make purchases.

As part of its franchise agreement, Prime Time agreed to various obligations to ensure operation of the Dayton Club in a manner that is consistent with all other DirectBuy buying clubs in the United States and Canada.  These include:

- A. Sell merchandise to members at cost without hidden retail markups, increased only by a small service or handling fee. On or about February 14, 2005, Prime Time agreed to an amendment to the Franchise Agreement entitled the DirectBuy Handling Fee Amendment (the "Handling Fee Amendment"). The Handling Fee Amendment restricted Prime Time to charging members a handling fee of no more than 8% of the cost of merchandise purchased for members. (Ex. G to Second Amended Complaint).

- B. Avoid conflicts of interest; faithfully, honestly and diligently perform obligations under the Franchise Agreement; and refrain from engaging in any other business that conflicted with Prime Time's obligation under the Franchise Agreement;

- C. At all times adhere to the highest standard of honesty, integrity, fair dealing and ethical conduct in all dealings with DirectBuy, members and the public;

D. Maintain the appearance of the DirectBuy branded Dayton club consistent with the uniform appearance and operation required by DirectBuy for all its buying clubs and to use the Dayton club only for the operation of a DirectBuy franchise; and

E. Submit all advertising and promotional materials used at the Prime Time facility for approval by DirectBuy.

Under the Franchise Agreement, Prime Time acknowledged that it had ''no proprietary interest whatsoever in the DIRECTBUY Marks licensed to Franchisee under [the] Agreement and that Franchisee's right to use the Marks [was] derived solely from [the] Agreement and [was] limited to the conduct of [its] business pursuant to and in compliance with [the] Agreement and all applicable specifications, standards and operating procedures prescribed by the Company from time to time during the term of the Franchise." (*See* Franchise Agreement at ¶ 5, attached as Exhibit A to the Amended Complaint) (Doc. # 101). Prime Time also acknowledged that "[a]ny unauthorized use of the Marks by Franchisee shall constitute an infringement of the rights of the Company and its licensor in and to the Marks." (*Id.*).

Under the Franchise Agreement, Prime Time further acknowledged that it would be exposed to confidential and proprietary "methods, techniques, formats, specifications, procedures, information, systems and knowledge of and experience in the operation and franchising of [UCC] including without limitation, supplier information, solicitation and sales techniques for prospective members, techniques for recruiting and training sales personnel, and computer programs and systems relating to merchandise orders" and that the "use or duplication of the Confidential Information in any other business would constitute an unfair method of competition." (See Franchise Agreement, ¶ 6).

Prime Time additionally agreed that upon the termination of the Franchise Agreement it would, among other things, (i) not directly or indirectly identify itself or any other business as a

current or former DirectBuy business; (ii) refrain from using the DirectBuy Mark; (iii) notify the telephone company and all listing agencies of the termination of its right to use any telephone number and any telephone directory listings associated with the DirectBuy Mark and to authorize the transfer of same to DirectBuy; and (iv) discontinue using any and all advertising materials, forms, and stationery supplies displaying the DirectBuy Mark. (Franchise Agreement ¶16(B).

**C.     Creation of HIWD**

In addition to more than700 manufacturers available through DirectBuy, each franchisee has the option of establishing additional supplier relationships with local providers. While Prime Time was still a DirectBuy franchisee operating the Dayton Club, its owner Dell Craaybeek and his wife, Brenda Craaybeek, created a new entity, defendant HIWD. HIWD supplied merchandise to Prime Time for the purpose of resale in the Dayton Club to Prime Time members through the DirectBuy marketing system. According to the Plaintiffs, the Craaybeeks concocted a scheme whereby they used HIWD as a conduit for member orders for products and services from local providers. As set forth in the Second Amended Complaint, the scheme worked in this fashion. Local vendors would offer products for sale to Prime Time. Rather than selling the products directly to the DirectBuy members at the price offered by that vendor, Prime Time would direct local vendors to sell their products to HIWD, who, in turn would mark up the products and resell them to DirectBuy members at the inflated price. Thus, instead of providing the local providers' goods and services directly to members without hidden retail markup, the Craaybeeks utilized HIWD to add substantial markups.

To facilitate this operation, HIWD placed advertisements for its products on the internet

under the DirectBuy Mark and instructed members to contact the Dayton Club operated by Prime Time. Further, HIWD used DirectBuy's confidential trade secret information about pricing and other matters to accomplish their scheme. The inflated prices charged to members resulted in huge additional hidden profits being reaped by Defendants totaling $789,381.52 in overcharges to members. Of these profits, HIWD allegedly sold $144,905.28 of merchandise to Indiana residents.[3]

Other than its alleged sale of merchandise to Indiana residents, HIWD has little to no contact with Indiana. It does not maintain offices, hold real property or have any bank accounts in Indiana. It does not pay Indiana taxes nor employ Indiana residents. Similarly, it is not a party to any agreement between Prime Time and DirectBuy nor is it subject to the forum-selection clause in the agreement between Prime Time and DirectBuy.

**D.     Creation of HSG**

As with the creation of HIWD the Second Amended Complaint alleges that, while Prime Time was a franchisee of DirectBuy, Dell Craaybeek along with an employee of HIWD, created HSG for the purpose of selling closets directly to Prime Time members. HSG operated within the Dayton Club and, plaintiffs assert, branded the closet line with the name "ClosetsDirectToYou" and the slogan "The #1 way to buy closets for your home" and utilized fonts, color schemes and patterns identical to those utilized by DirectBuy ("DirectBuy – The #1 way to buy direct for your home."). The plaintiffs further allege that by infringing on the

---

[3]Of course, HIWD disputes these allegations and claims that members actually received discounts when members placed orders through Prime Time for HIWD products.

DirectBuy mark, HSG injured DirectBuy in Indiana.

Similar to HIWD, HSG owns no property in Indiana, owns no bank accounts in Indiana, does not pay Indiana taxes, employ Indiana residents and does not conduct business in Indiana.

**DISCUSSION**

Both HIWD and HSG challenge the assertion of personal jurisdiction over them in Indiana, each claiming that they do not have the requisite contacts with Indiana so as to permit exercise of jurisdiction over them. When a defendant challenges the Court's personal jurisdiction, the plaintiff bears the burden of demonstrating that the Court may exercise such jurisdiction. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir.2003). The Court accepts all well-pleaded jurisdictional allegations in the complaint as true unless controverted by affidavit. *See Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir.2002). If the defendant supplies affidavits challenging personal jurisdiction, the plaintiff must meet those assertions with affirmative evidence that supports the presence of jurisdiction. *See Purdue Research* at 783. In the absence of an evidentiary hearing, the Court resolves all relevant factual disputes in favor of the plaintiff, and the plaintiff need only make a "prima facie" showing that the Court may exercise personal jurisdiction. *Id.* at 782.

Depending on the type of contact with the forum state, it is possible for the Court to exercise either general or specific personal jurisdiction. General jurisdiction exists if there are "continuous and systematic" contacts with Indiana so that the defendant would reasonably anticipate being under the jurisdiction of Indiana. *LinkAmerica Corp. v. Albert,* 857 N.E.2d 961, 966–68 (Ind. 2006). If there are not the type of continuous contacts to create general jurisdiction

8

over a defendant, specific jurisdiction may be found "where a suit arises out of or is related to the defendant's contacts with the forum." *Citadel Group,* 536 F.3d at 760.

In Indiana, exercise of specific personal jurisdiction depends on whether the requirements of the state's long-arm statute are met and whether federal due process requirements are satisfied. *Nerds On Call, Inc. (Indiana) vs. Nerds On Call, Inc. (California),* 598 F. Supp. 2d 913, 915 (S.D. Ind. 2008). Indiana's long-arm statute, Trial Rule 4.4(A), provides in pertinent part that an Indiana court "may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States." Thus, because the long-arm statute is "co-extensive with the limits of federal due process, the court applies federal due process standards." *Nerds On Call,* 598 F. Supp. 2d at 915.

The Due Process Clause of the Fourteenth Amendment prevents a state from exercising specific jurisdiction over a defendant, unless the defendant had "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)). A state has an interest in providing its residents with a forum for redressing harms caused by an out-of-state actor, particularly where the out-of-state actor has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473, 475 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)). The defendant's contacts must not be merely random, fortuitous, or attenuated; rather, the "defendant's conduct and connection with the forum State" must be such that it should "reasonably anticipate being haled into court there." *Id.* at 474–75 (quoting *World-Wide*

*Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)).

### A. General Jurisdiction over HIWD

DirectBuy asserts, albeit in a weakly formulated argument, that HIWD has systematic and continuous contact with Indiana sufficient to warrant application of general jurisdiction. According to DirectBuy, these contacts are found in the fact that HIWD "operated out of the DirectBuy showroom where Prime Time operated its franchise" and in the fact that some of Prime Time's members were Indiana residents and thus, HIWD had a hand at selling merchandise to these members. (Response Brief, p. 20).

"The continuous and systematic contacts standard under general jurisdiction is 'considerably more stringent' than the minimum contacts standard under specific jurisdiction." *Winston v. Martinair, Inc.,* 2007 WL 684113 (N.D.Ill.). Factors that courts examine in determining general jurisdiction include: (i) whether and to what extent the defendant conducts business in the state; (ii) whether the defendant maintains offices in the state; (iii) whether the defendant maintains employees in the state; (iv) whether the defendant advertises or solicits business from the forum state; and (v) whether the defendant has a designated agent for service of process. *See Helicopteros Nationales de Colombia v. Hall,* 466 U.S. 408, 416 (1984).

Here, there is no doubt that HIWD does not have the type of "continuous and systematic" contacts with the state of Indiana to permit this court to exercise general jurisdiction. HIWD has no offices, no employees, no business accounts and no designated agent for service of process in Indiana. It has no regular contacts with Indiana so as to purposely avail itself of an Indiana

forum. To the extent, HIWD sold products to Indiana residents who were members of the Dayton Club, the amount and nature of the sales is such that it does not warrant the exercise of general jurisdiction. Accordingly, the court turns to DirectBuy's alternative argument that specific jurisdiction is proper.

### B. Specific Personal Jurisdiction over HIWD

DirectBuy does not dispute that HIWD is not a party to the Prime Time franchise agreement and has no direct contractual relationship with DirectBuy. For this reason, DirectBuy looks to the "effects doctrine" to assert that HIWD should be haled into court in Indiana because the economic effects of its interference with DirectBuy's business were felt in Indiana. Under that doctrine, personal jurisdiction over a nonresident defendant is proper when defendant's intentional tortious actions aimed at the forum state cause harm to plaintiff in the forum state. See *Calder v. Jones*, 465 U.S. 783, 788-90 (1984).[4] The effects doctrine is interpreted broadly to permit the state in which the injury (and therefore the tort) occurs to entertain the suit, even if all other relevant conduct occurred outside the state. *Janmark, Inc. v. Reidy,* 132 F.3d 1200, 1202–03 (7th Cir. 1997).

In *Janmark* a seller of mini shopping carts brought an action against a competitor and its

---

[4] In *Calder v. Jones,* 465 U.S. 783 (1984), the Court held that the state in which the victim of defamation lived had jurisdiction over the victim's defamation suit. The defendants in *Calder,* both residents of Florida, were involved in writing an allegedly libelous article for the *National Enquirer* about the plaintiff, a resident of California. *Id.* at 784–786. The Court characterized defendants actions as "intentional, and allegedly tortious, actions [which] were expressly aimed at California" and were not "mere untargeted negligence." *Id.* at 789. The defendants knew that the article would have an adverse impact upon the plaintiff, the brunt of which would be felt largely in California. *Id.* at 789–790.

operator for a declaratory judgment that it had not infringed on the defendants' copyright, as well as for tortious interference with prospective economic advantage. *Id.* at 1201. The district court found that a single phone call from the defendant in California to one of the plaintiff's customers in New Jersey could not be a tort "within" Illinois and dismissed the defendant for lack of personal jurisdiction. *Id.* The Seventh Circuit reversed, reasoning that without an injury there is no tort, and that because a wrong does not become a tort until an injury has occurred, the location of the injury is vital to understanding where the tort occurred. *Id.* at 1202. Because the injury took place in Illinois, the tort occurred in Illinois, and thus was actionable in Illinois. *Id.*

The Seventh Circuit extended the effects test to the trademark context in *Indianapolis Colts v. Metro. Baltimore Football Club, L.P.,* 34 F.3d 410 (7th Cir.1994). That case involved a trademark dispute between the Colts of the National Football League, and the recently created Baltimore CFL Colts. *Id.* at 411. The only activity of the Baltimore team undertaken or planned in Indiana at that point was the broadcast of its games, which would be shown nationwide. *Id.* Nonetheless, the Court concluded that the Indianapolis Colts' trademarks would have effects in Indiana and therefore jurisdiction was proper under the Supreme Court's reasoning in *Calder. Id.* at 411–412.

Here, DirectBuy asserts that because HIWD utilized the DirectBuy Marks as well as the Dayton Club; advertised under the DirectBuy Mark and sold products in contravention of the DirectBuy business model, it not only knew its conduct was infringing on DirectBuy's Marks but it was well aware that its conduct was causing injury in Indiana to DirectBuy. It further points out that HIWD did sell merchandise through the Dayton Club to residents of Indiana thereby causing injury to those residents. Moreover, it asserts that because the principal owners

of HIWD had a franchise relationship with DirectBuy, HIWD clearly intended by its acts to cause harm to DirectBuy, headquartered in Indiana.

In response, HIWD argues that any alleged tortious activity occurred in Ohio and it has no contractual connection with DirectBuy and no other Indiana contacts. But, these arguments are misplaced. Although the allegedly tortious conduct occurred in Ohio, the effects of that injury can certainly be said to be suffered by DirectBuy in Indiana. HIWD's principal owners who did, in fact, have a contractual relationship with DirectBuy, knew that DirectBuy was an Indiana corporation and were aware that they serviced Indiana customers. Certainly the knowledge that DirectBuy's principal place of business was in Indiana translates into a reasonable expectation that the effects of the tortious conduct, namely the injury to goodwill and reputation, would be most severe there. Moreover, the evidence before the court supports a prima facie finding of jurisdiction in that HIWD also sold products to Indiana residents using the DirectBuy business model and advertising utilizing the DirectBuy Marks.

To assert, as HIWD does in its motion, that it is simply an Ohio corporation with no real contacts to Indiana is disingenuous given the interplay between HIWD and Prime Time, which evidences an intention to inflict harm on DirectBuy. The common thread in the line of "effects test" cases is the *intentional* infliction of harm to a plaintiff in the forum state. Without intentional actions causing foreseeable harm in the forum state, there can be no personal jurisdiction under the effects test. *See Novelty, Inc. v. RCB Distributing, Inc*. 2008 WL 2705532, 3 (S.D. Ind. 2008). As DirectBuy has demonstrated the owner of Prime Time, Dell Craaybeek, played a significant business role in the formation of HIWD. Prime Time and Craaybeek had full knowledge of the DirectBuy business model, its marketing techniques, access to the

13

DirectBuy Mark and access to a steady flow of customers all of whom relied upon the representations made by Prime Time through the DirectBuy model. This court refuses to read the effects doctrine so narrowly as to insulate HIWD from having to answer for its alleged injury to an Indiana corporation merely by its suggestion that the corporation had no formal business ties to Indiana when it had access to and allegedly attempted to profit from the DirectBuy business model. Accordingly, the court concludes that DirectBuy has sufficiently alleged that HIWD intended to cause harm to DirectBuy in Indiana and personal jurisdiction over HIWD is proper.

      C.      **Specific Personal Jurisdiction over HSG**

Turning now to HSG's argument, DirectBuy concedes that HSG is not subject to this Court's general jurisdiction but argues instead that this Court has the more limited specific personal jurisdiction. According to plaintiffs, when HSG utilized its name "ClosetsDirectToYou" and its marketing slogan "The #1 way to buy closets for your home," both of which are similar to the DirectBuy Mark, to sell closets in Ohio to Dayton Club members, the trademark violation again had effects for DirectBuy in Indiana and, thus, personal jurisdiction is proper. As part of this allegation, DirectBuy asserts that HSG knew it would harm DirectBuy in Indiana when it utilized a similar slogan since the founders of HSG had a franchise agreement with DirectBuy and had already established a customer base which included some Indiana residents at the Dayton Club. Unlike the allegations against HIWD, however, there is no allegation that any HSG products were actually sold to Indiana residents although there are allegations that products were marketed to Indiana members of the Dayton Club through

advertising there and by the use of direct mail solicitations. For this reason, HSG asserts that because it did not sell any closets to Indiana residents, the "effects" test has not been met.

It is true that even under the effects doctrine, "a court must still assess each defendant's contacts with the forum state." *Ferris Mfg. Corp. v. S.P.R.D.,* No. 07 C 466, 2007 WL 1438375, at *4 (N.D. Ill. May 15, 2007); *Family Watchdog, LLC v. Schweiss* , 2009 WL 276856, 4 (S.D. Ind. 2009) ("Jurisdiction over a defendant *may* be proper when the injury to the trademark occurred in Indiana, but the existence of other contacts with the forum must be established."); *Wallace v. Herron,* 778 F.2d 391 (7th Cir. 1985) ("We do not believe that the Supreme Court, in *Calder,* was saying that any plaintiff may hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff.").

In *Nerds on Call, Inc. (Indiana)*, the Southern District of Indiana, on reconsideration, examined the type of additional contacts required under the effect test. In that case, the court concluded that it lacked specific personal jurisdiction over the California defendants in a trademark infringement suit brought by a provider of on-site computer and other technical assistance, despite the plaintiff's claim that the alleged injury to goodwill and reputation would occur in Indiana. There, the court held that some "intentional targeting"[5] of the forum was required and the defendants, who had not used the mark in Indiana or acted with the intent to enter Indiana or to harm the provider, did not have the requisite minimum contacts for purposes

---

[5]The court specifically rejected a reading of the case law that required "entry" by a defendant into the forum state. *See Nerds on Call, Inc.*, 598 F. Supp. 2d at 917–918. Rather the court noted that in *Janmark,* the Seventh Circuit held that the "entry" into a given jurisdiction can be merely the intentional aiming of tortious conduct. *Janmark*, 132 F.3d at 1202-1203.

of the claims pled, despite claims that defendants had "entered" Indiana through a website, and through a federal trademark. *Nerds on Call, Inc. (Indiana),* 598 F. Supp. 2d at 918.

Here, the allegations in the Complaint demonstrate that by utilizing the Dayton Club as a base of operations for its allegedly infringing name and slogan, HSG intended to target DirectBuy members of the Dayton Club. Included in those memberships were a fair number of Indiana residents who utilized the Dayton Club to receive the savings promised them through the DirectBuy model. Thus, although it is a closer call than the allegations against HIWD, the court must assume at this stage that the allegations as pled are true and HSG intentionally targeted DirectBuy's customer base by utilizing the Dayton Club (operated by one of Prime Time's principals) which included Indiana residents using direct mailing solicitations and advertising within the Dayton Club. The "effect" of this intentional targeting was to harm DirectBuy in Indiana. This type of intentional targeting is sufficient to justify personal jurisdiction over HSG. Accordingly, HSG's Motion to Dismiss is DENIED.

## CONCLUSION

In sum, what is alleged in the Second Amended Complaint is a scheme concocted by an individual franchisee, Defendant Prime Time, to create entities to circumvent the contractual obligations contained in its franchise agreement with DirectBuy and to earn greater profits than what are called for in the franchise agreement. To do this, Prime Time, HIWD, and HSG allegedly acted together for the purpose of intentionally harming DirectBuy, an Indiana corporation. Based upon the allegations, which the court assumes true at this point, personal jurisdiction is proper in Indiana. Accordingly, Defendant HIWD's Motion to Dismiss, DE 131

and Defendant HSG's Motion to Dismiss, DE 129 are both DENIED.

SO ORDERED on February 9, 2010.

   S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE