United States District Court
Northern District of Indiana
Hammond Division

| | |
|---|---|
| UNITED CONSUMERS CLUB, INC. and DIRECTBUY, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| PRIME TIME MARKETING MANAGEMENT, INC, DELL CRAAYBEEK, and BRENDA CRAAYBEEK, | ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 2-07-CV-358

**OPINION AND ORDER**

From April 1, 1992, until May 11, 2007, Plaintiffs United Consumer Club, Inc., and DirectBuy, Inc., (collectively "Direct Buy") were in a Franchise Agreement with Prime Time Marketing Management, Inc., Dell Craaybeek, and Brenda Craaybeek. The events that occurred during the Franchise Agreement, the termination of that agreement, and the business relationship subsequent to that termination are the source of the claims at hand. On December 30, 2009, Plaintiffs filed a Motion for Judgment on the Pleadings on Prime Time's Amended Counterclaims. (DE 201.)

**A. Standard of Review**

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is evaluated by the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (citing *Guise v. BWM Mortgage, LLC*, 377 F.3d 795, 798 (7th Cir. 2004)).

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim is to test the sufficiency of the pleading, not to decide the merits of the case. *See Gibson v. Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). Rule 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." However, "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). As the Supreme Court has stated, "the tenant that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 1940 (quoting *Twombly*, 550 U.S. at 570). A complaint is facially plausible if a court can reasonably infer from factual content in the pleading that the defendant is liable for the alleged wrongdoing. *Id.* (citing *Twombly*, 550 U.S. at 570). The Seventh Circuit has synthesized the standard into three requirements. "First, a plaintiff must provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

**B. Procedural History**

On September 11, 2007, Prime Time filed suit against DirectBuy in the Court of Common Pleas, Montgomery County, Ohio. The case was removed to the United States District

Court for the Southern District of Ohio on October 12, 2007. On October 11, 2007, United Consumers Club and DirectBuy filed a Complaint against Prime Time, Dell Craaybeek, and Brenda Craaybeek in this Court. The case filed by Prime Time in Ohio was transferred to this Court on February 4, 2008, and was assigned Case No. 3:08-CV-60. On October 16, 2008, the two cases were consolidated as Case No. 2:07-CV-358. Now before this Court is Plaintiffs' Motion for Judgment on the Pleadings regarding the counts asserted by Prime Time in the Amended Counterclaim.

**C. Factual Background**

When reviewing a 12(c) motion for judgement on the pleadings, the court follows the standard for a motion to dismiss, accepting the facts alleged in the counterclaims as true and drawing all reasonable inferences in favor of the claimant. *See Pisciotta*, 499 F.3d at 633.

D.D.O. Management, Inc., entered into a franchise agreement on November 17, 1986, with DirectBuy, an Indiana business corporation. (DE 104, Am. Countercl. ¶¶ 3, 5.) The agreement allowed D.D.O. to operate a DirectBuy members-only buying club in Ohio. (DE 104, Am. Countercl. ¶ 6.) In April 1992, after receiving DirectBuy's approval, D.D.O. assigned its rights, title, and interest under the franchise agreement to Prime Time, an Ohio business corporation. (DE 104, Am. Countercl. ¶¶ 2, 7.) Per DirectBuy's requirements, Prime Time hired and trained employees and leased premises in Dayton, Ohio, for the operation of the club. (DE 104, Am. Countercl. ¶¶ 20–22.)

Under the terms of the agreement, Prime Time sold membership to its club, for which DirectBuy received royalty fees. (DE 104, Am. Countercl. ¶ 8.) Monies received from Prime Time's members were placed in a "Merchandise Account" from which DirectBuy would take its

share of the fees. (DE 104, Am. Countercl. ¶¶ 18–19.) DirectBuy negotiated with about seven hundred national vendors from whom Prime Time's members could order merchandise. (DE 104, Am. Countercl. ¶ 9.) Prime Time alleges that some of these vendors provided DirectBuy with perks and kickbacks which were not disclosed to its members. (DE 104, Am. Countercl. ¶ 9.) DirectBuy allows their franchisees, with approval, to establish additional supplier relationships to enhance product selection. (DE 104, Am. Countercl. ¶ 10.) Prime Time alleges that DirectBuy received hidden perks and kickbacks from these additional suppliers as well. (DE 104, Am. Countercl. ¶ 11.)

Prime Time further alleges that DirectBuy sometimes failed to provide quality products in a timely manner, and that DirectBuy paid internet specialists to "bury" complaints posted by dissatisfied members. (DE 104, Am. Countercl. ¶¶ 12–13.) Prime Time asserts that through its approved use of local venders, it provided superior service and pricing which created great revenue and good will. (DE 104, Am. Countercl. ¶¶ 14–17.) One such local vendor was Home Improvement Wholesale Distributors, Inc. ("HIWD"), a company wholly owned by Mr. Craaybeek. (DE 201, Pl.'s Mot. 4.)

On February 14, 2005, the parties added the "Handling Fee Amendment" to the franchise agreement which allowed Prime Time to charge a handling fee of no more than 8% of the actual cost of the merchandise and exempted DirectBuy from any liability in connection with the fee. (DE 104, Am. Countercl. ¶¶ 23–25.) The agreement was later extended until February 17, 2007. (DE 104, Am. Countercl. ¶ 26.) On May 11, 2007, DirectBuy terminated its business relationship with Prime Time. (DE 169, Def.'s Ans. ¶ 28.) Prime Time asserts that it was without cause or warning and was done intentionally to punish and destroy Prime Time and assume its membership rights and fees. (DE 104, Am. Countercl. ¶¶ 28–29.) DirectBuy claims the

termination was predicated on Prime Time's alleged marked-up merchandise practices with HIWD. (DE 169, Def.'s Ans. ¶ 28.) While Prime Time alleges that they were purchasing "value-added merchandise" from HIWD and that their relationship with HIWD was clearly recognized on DirectBuy's website, DirectBuy asserts that it was unaware of the price mark-up scheme. (DE 104, Am. Countercl. ¶ 56; DE 201, Pl.'s Mot. 4.) Prime Time claims that DirectBuy's true complaint was that HIWD was not providing Direct Buy perks or kickbacks. (DE 104, Am. Countercl. ¶ 56.)

Prime Time alleges that after the termination of the business relationship, DirectBuy instructed Prime Time to continue servicing Prime Time's former members. (DE 104, Am. Countercl. ¶ 30.) Furthermore, Prime Time alleges that even without a formal agreement, the business relationship continued and was highly beneficial to DirectBuy. (DE 104, Am. Countercl. ¶¶ 31–32.) Prime Time claims that although it provided services for less than the national venders, DirectBuy wrongfully terminated the relationship on false and unsubstantiated accusations of overcharges totalling $789,351.52. (DE 104, Am. Countercl. ¶¶ 33–35.) Prime Time asserts that they promptly complied with DirectBuy's request that they terminate certain employees and return all merchandise, advertising materials, forms, and stationary supplies displaying DirectBuy's mark. (DE 104, Am. Countercl. ¶¶ 36–37.) Additionally, Prime Time alleges that they provided $120,000 worth of services to former members for which DirectBuy never compensated them. (DE 104, Am. Countercl. ¶ 38.) Prime Time seeks compensation for their labor, the use of their property, the use of their memberships, and the confiscation of their good will and funds. (DE 104, Am. Countercl. ¶¶ 44, 48–49, 52.)

**D. Analysis**

**(1)** *Wrongful Termination of the Franchise*

Prime Time alleges that DirectBuy wrongly terminated the franchise, because they did not meet the express conditions to terminate provided in the franchise agreement. DirectBuy argues that Prime Time's claim fails because DirectBuy has conclusively demonstrated that they lawfully terminated the franchise on the basis of Prime Time's breach of the franchise agreement. This argument fails, however, since it is premature to settle facts in dispute regarding what events took place, if those events constituted a breach of contract, and which party breached first. The facts as presented by Prime Time state a claim for which relief can be granted, therefore, the Motion for Judgment on the Pleadings is denied.

**(2)** *Breach of Contract for failure to purchase membership rights*

Prime Time next alleges that DirectBuy breached the contract by taking control of Prime Time's membership rights without purchasing them in the time-frame stipulated in the contract. They contend that DirectBuy needed to purchase the list in addition to assuming Prime Time's remaining contractual obligations. To support this argument, Prime Time interprets the contractual language "in consideration of" to mean that the parties should "evaluate" the contractual obligations DirectBuy would assume when arriving at the purchase price for the membership rights. However, the plain and unambiguous language of the contract trumps Prime Time's allegations. *See McWane, Inc. V. Crow Chi. Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000). The contract between the parties states that Direct Buy has "the option to purchase any and all rights of the FRANCHISEE . . . under membership agreement for membership in the Club . . . in consideration of the assumption of the contractual obligations of the FRANCHISEE." As DirectBuy argues, it is well established that in contracts "consideration" is

the bargained for return that the promisor is entitled to from the promisee. The contract clearly states that DirectBuy's only obligation in exercising their right to the existing membership contracts was to assume Prime Time's remaining contractual obligations. Because Prime Time has not alleged that DirectBuy breached that obligation in any manner, they have failed to show that they are entitled to relief and DirectBuy's Motion for Judgment on the Pleadings is granted.

**(3) *Breach of Contract for failure to return funds***

Prime Time claims that DirectBuy breached section 8 of the franchise agreement by refusing to return funds to Prime Time. While this statement could entitle Prime Time to relief, a simple claim that funds are owed is too vague "to provide sufficient notice to defendants of the plaintiff's claim."*Brooks*, 578 F.3d at 581. Accordingly, DirectBuy's Motion for Judgment on the Pleadings is granted with leave to amend.

**(4) *Conversion***

Prime Time next alleges that traceable and earmarked funds belonging to them were withheld by DirectBuy. While DirectBuy challenges the plausibility and specificity of the claim, it is premature at this point to determine if this earmarked money exists and if that money is indeed owed. Prime Time has sufficiently stated a claim and the Motion for Judgment on the Pleadings is denied.

**(5) *Breach of Contract for failure to compensate for use of leased property***

Prime Time's fifth claim arises from DirectBuy's use of their leased property. Prime Time alleges that DirectBuy promised to pay for the use of the property and that without this

7

agreement, Prime Time never would have allowed the use of the premises. Prime Time further alleges that despite their promise, DirectBuy refused to compensate them when Prime Time attempted to collect the money owed. DirectBuy argues that Prime Time fails to state a claim because they do not allege any agreed-upon terms between the parties, therefore, failing the standard of an implied contract. This argument fails, however, because the Complaint includes sufficient facts to establish an oral contract, an alleged breach, and resulting damages. DirectBuy's Motion for Judgment on the Pleadings is denied.

**(6)** *Fraud*

Prime Time alleges that DirectBuy committed fraud by promising to pay for the use of Prime Time's property and employees while having no actual intention of abiding by that promise. DirectBuy rightfully contends that a claim of fraud cannot be predicated on a promise for future action. Instead, the claim must be based upon a misrepresentation of existing fact. *See Wiltberger v. Davis*, No. 93AP-1031, 1994 WL 321081, at *4 (Ohio Ct. App. June 30, 1994) (affirming that Ohio law firmly established "that a misrepresentation, in order to be the basis for an action for fraud, must relate to a fact which either exists in the present or has existed in the past"). Accordingly, DirectBuy's Motion for Judgment on the Pleadings is granted.

**(7)** *Tortious Interference with Contract*

Prime Time also claims that DirectBuy tortiously interefered with their contract. As DirectBuy stipulates in their motion, Prime need only show "(1)the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages." *Kenty v. Transamerica*

8

*Prem. Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995). While Prime Time's construction of the claim is formulaic, they assert sufficient allegations to state a claim for which relief can be granted. Prime Time contends that both parties knowingly participated in a business relationship, that DirectBuy intentionally terminated the relationship without justification, and that damages resulted. Prime Time specifically states that their damages include, but are not limited to, the loss of 3,000 memberships. Accepting the facts alleged in the couterclaim as true, the Court must deny DirectBuy's Motion for Judgment on the Pleadings

**(8)** *Breach of Implied Contract*

Prime Time asserts that there existed between the parties an implied contract which continued under the terms of the previously terminated contract. Furthermore, they allege that while under this implied contract they were not compensated by DirectBuy, which constitutes a breach and damages. DirectBuy contends that this claim fails to establish the existence of an agreement, mutual assent, the intent do be bound, breach and damages. Instead, they assert that even if such contract existed, it would be in effect for an indefinite term and terminable at will after a reasonable duration and notice. Despite DirectBuy's claims to the contrary, this Court holds that Prime Time has provided sufficient factual allegations and notice of its claims. It is premature for the court to determine if the implied contract was breached "after a reasonable duration and on reasonable notice" as required under Ohio law. *Miller v. Wikel Mfg. Co.*, 545 N.E.2d 76, 79 (Ohio 1989). Therefore, DirectBuy's Motion for Judgment on the Pleadings is denied.

**(9)** *Unjust Enrichment*

Prime Time claims that by the use of their premises, employees, services, member lists, and good will, DirectBuy was benefitted without giving sufficient consideration to Prime Time. They allege that it is unjust for DirectBuy to retain the benefits without providing compensation. DirectBuy contends that Prime Time has failed to show all the elements of an unjust enrichment claim and that all of DirectBuy's conduct was authorized by the Agreement. Again, however, this determination would be premature. Without knowing who breached the contract and the degree of detriment to Prime Time, the Court cannot dismiss the claim. Even if some of the damages alleged are covered by the contract, not all damages are. Therefore, the Court denies DirectBuy's Motion for Judgment on the Pleadings.

**(10)** *Request for declaratory judgment regarding overcharges*

Prime Time requests that the Court enter a declaratory judgment stating that Prime Time is not required to pay the overcharges that DirectBuy claims they charged. In response, DirectBuy claims that the request is defective because Prime Time breached the agreement and charged unauthorized fees. It is premature, however, for the court to determine whether or not Prime Time violated the agreement and whether or not they should be required to pay the overcharges. Accordingly, DirectBuy's Motion for Judgment on the Pleadings is denied.

**(11)** *Breach of Covenant of Good Faith and Fair Dealing*

Prime Time claims that DirectBuy's act constitute a breach of the implicit covenant of good faith and fair dealing. DirectBuy contends that Prime Time cannot allege good faith and fair dealing as an independent cause of action. While it is true that under Ohio law "there is no claim for breach of the implied covenants of good faith and fair dealing independent of a breach

of contract action," Prime Time has brought a breach of contract action. *Mortgage Elec. Registration Sys., Inc. v. Mosley*, No. 93170, splip op. at 11 (Ohio Ct. App. June 24, 2010). Since there are other breach of contract claims that survive, this claim survives with them.

**(12)** *Breach of Fiduciary Duty and Action for Accounting*

Prime Time's final claims against DirectBuy alleges that a fiduciary relationship was formed when DirectBuy exerting control and influence over Prime Time's customers, good will, funds, and resources. Prime Time asserts that damages resulted when DirectBuy violated their fiduciary duty by failing to account or compensate for the resources and assets of Prime Time. DirectBuy contends that such a claim is contrary to the terms of the Agreement and insufficiently pled. "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Employment of Pratt*, 321 N.E.2d 603, 609 (Ohio 1974). Under Ohio law a "fiduciary relationship does not exists between a franchisor and a franchisee in the absence of a statute expressly creating such fiduciary relationship or, in the alternative, absent an understanding, held by both parties to the subject agreement, that a special trust and confidence has been reposed by the franchisee to the franchisor." *Saydell v. Geppetto's Pizza & Ribs Franchise Sys., Inc.*, 652 N.E.2d 218, 231 (Ohio Ct. App. 1994). While the general rule may be that franchise agreements do not give rise to fiduciary relationships, it is premature for the Court to hold that no such relationship existed either before or after the termination of the agreement and whether or not DirectBuy breached any duties if such a relationship had been formed. Accordingly, DirectBuy's Motion for Judgment on the Pleadings is denied.

**E. Conclusion**

The Court GRANTS in part and DENIES in part Plaintiff's Motion for Judgment on the Pleadings.

SO ORDERED on August 23, 2010.

    s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE
HAMMOND DIVISION