UNITED CONSUMERS CLUB, INC.;      )
DIRECTBUY, INC.,                  )
                                  )
            Plaintiffs            )
                                  )
      v.                          )   Case No. 2:07 cv 358
                                  )
PRIME TIME MARKETING MANAGEMENT)
INC.; DELL CRAAYBEEK; BRENDA      )
CRAAYBEEK,                        )
                                  )
            Defendants            )
******************************)
PRIME TIME MARKETING MANAGEMENT)
INC.; DELL CRAAYBEEK,             )
                                  )
            Plaintiffs            )
                                  )
      v.                          )   Case No. 3:08 cv 60
                                  )
DIRECTBUY, INC., BETA FINANCE  )
COMPANY, INC.; UNITED CONSUMERS)
CLUB, INC.;                       )
                                  )
            Defendants            )

## OPINION AND ORDER

This matter is before the court on the Second Motion to
Compel Discovery in Accordance with Fed. R. Civ. P. 37 [DE 216]
filed by Prime Time Marketing Management, Inc. on February 17,
2010; the Motion for Sanctions in Accordance with Fed. R. Civ. P.
37 [DE 218] filed by Prime Time on February 17, 2010; and the
Motion to Compel DirectBuy's General Counsel, C. Joseph Yast, to
Submit to a Deposition and Provide Complete Answers in Accordance
with Fed. R. Civ. P. 37(a)(3)(B)(i) [DE 220] filed by Prime Time

on March 3, 2010.  For the following reasons, the Second Motion
to Compel Discovery is GRANTED, the Motion for Sanctions is
DENIED, and the Motion to Compel DirectBuy's General Counsel, C.
Joseph Yast to Submit to a Deposition and Provide Complete
Answers is GRANTED.

Background

The defendant, Prime Time Marketing Management, Inc., was a
franchisee of DirectBuy, Inc. from 1986 through 2007.  Prime Time
was owned and operated by Dell Craaybeek.  On May 11, 2007,
DirectBuy's General Counsel, C. Joseph Yast, sent Craaybeek a
letter terminating Prime Time's franchise with DirectBuy alleg-
edly for violating its Franchise Agreement.  DirectBuy alleges
that an audit conducted by Integrity Assurance in 2007 demon-
strated that Prime Time was using another business owned by
Craaybeek, Home Improvement Wholesale Distributors, Inc., as a
supplier without prior approval by DirectBuy and was overcharging
DirectBuy members through the use of impermissible handling fees
and price mark-ups in violation of the Franchise Agreement.
DirectBuy brought this suit to recover damages incurred by Prime
Time's alleged violations of the Franchise Agreement.

On May 23, 2008, Prime Time submitted its First Request for
Production of Documents to DirectBuy.  Prime Time requested all
documents relating to Prime Time from 2002 through the present,

all documents relating to the termination of the Franchise Agreement, and all documents relating to DirectBuy's calculations of damages.  Prime Time's Request No. 16 sought "[a]ll documents that refer or relate to any and all vendors other than Direct-Buy's national suppliers that provided goods or services to DirectBuy Members, including but not limited to all local vendors, outside suppliers and merchant members from January 1, 2000, to date."  (Deft. Doc. Req. No. 16, Ex. A to Deft. Mot. to Compel Disc. at p. 7)  Additionally, Prime Time requested "[a]ll documents and communications that refer or relate to any audit or financial review, or the preparation for any audit or financial review, of Prime Time [or] HIWD by DirectBuy, including the forensic audit of Prime Time and HIWD conducted in 2007 by Integrity Assurance."  (Deft. Doc. Req. No. 15, Ex. A to Deft. Mot. to Compel Disc., at p. 7)  Finally, Document Request 66 requested "[a]ll documents that refer or relate to any expert witnesses [DirectBuy] expect[s] to call, including notes, calculations, file materials and all other documents provided to, referenced by or relied upon by any such expert."  (Deft. Doc. Req. No. 66, Ex. A to Deft. Mot. to Compel Disc. at p. 12)  Prime Time also requested that DirectBuy identify any party having possession or custody of any requested documents if DirectBuy did not have possession of the requested materials.

On October 7, 2008, DirectBuy responded to Prime Time's First Set of Interrogatories and Request for Documents by providing Prime Time with nearly 12,000 pages of documents. One of these documents, Bates stamped "DB 1510," made reference to a payment of $1,250 from DirectBuy to Scott Stout for an appraisal of the Dayton Center, which is the location of Prime Time's former DirectBuy franchise. However, the appraisal was not included in any of the documents produced by DirectBuy. Prime Time contends that Stout's appraisal of Prime Time is relevant to the issue of Prime Time's damages in this case and that DirectBuy should have produced this document in response to Document Request No. 3 of Prime Time's First Request for the Production of Documents, which requests "all documents that refer or relate to Prime Time." (Deft. Doc. Req. No. 3, Ex. A to Deft. Mot. to Compel Disc. at p. 6) Further, Prime Time specifically has requested this document several times, beginning on February 4, 2009. In response to these requests, DirectBuy has maintained that it does not have Stout's appraisal of Prime Time in its possession and that Prime Time should have subpoenaed Stout for these documents.

On December 5, 2008, Prime Time informed DirectBuy that many of DirectBuy's responses were deficient, including Request No. 16. After failing to resolve this discovery dispute, Prime Time

filed its First Motion to Compel Discovery on February 12, 2009, and a Motion for Extension of Time to Complete Discovery on February 17, 2009. On February 25, 2009, two days before the February 27, 2009 deadline for discovery, DirectBuy provided Prime Time with a privilege log and the answers to three of Prime Time's interrogatories, which DirectBuy had promised to provide since December 12, 2008.

This court ruled on Prime Time's two motions on September 25, 2009. In relevant part, this court found that the information requested by Prime Time's Document Request No. 16 was relevant to the first prong of Prime Time's laches defense, because "[s]uch information could prove Prime Time's argument that DirectBuy knew of local vendor relationships and allowed them to occur with regularity, thus showing that DirectBuy slept on its rights." (Opinion & Order [DE 172], p. 9) There, court noted that both parties had been culpable with regards to the discovery difficulties. Although the court noted that Prime Time had made a good faith effort to obtain the requested information without court intervention, many of its initial requests were overbroad, and Prime Time did not limit these requests until after DirectBuy responded to the motion. It also was noted that "although DirectBuy indicated that it would cooperate, it was not until Prime Time filed a motion to compel that DirectBuy followed

through with its months-old promise." Id. at 15.  Therefore, the court found that the parties' joint culpability did not warrant an imposition of fees but warned both parties that "any subsequent discovery motions will include court imposed attorney's fees."  Id.

In the same Opinion and Order, this court also granted Prime Time's motion to extend the discovery deadline to November 24, 2009, in order to accommodate Prime Time's need to depose DirectBuy's key witnesses.  (Opinion and Order [DE 172], p. 19)

On or about November 1, 2009, DirectBuy provided Prime Time with over 400 applications from all of DirectBuy's franchisees seeking to conduct business with local vendors that were not approved from 2002 to 2007.  DirectBuy contends that these were the only documents showing DirectBuy's disapproval of local vendor applications in its possession and that the production of these documents fulfilled its obligations under the September 25, 2009 Opinion and Order.  However, Prime Time alleges that DirectBuy failed to comply with this Order by withholding material information indicating that DirectBuy had knowledge of the use of unapproved local vendors by its franchisees and that DirectBuy had written policies governing the use of such local vendors by its franchisees which it failed to produce.  To support this claim, Prime Time points to a "Notice to All DirectBuy Centers"

that it received from a third party at the end of the discovery
period.  The Notice, written by DirectBuy's General Counsel Yast
on May 30, 2007, prohibited all DirectBuy franchisees from con-
ducting any further business with an outside supplier, Direct
Depot.  However, the Notice mentioned that franchisees could
continue using the outside suppliers they already had in place
pending DirectBuy's ultimate approval of those suppliers.
Additionally, the Notice referenced "CSC's Outside Supplier
initiative" from 2007, which Prime Time contends is evidence of
DirectBuy's policies regarding the use of unapproved local
vendors, which it should have produced in response to the Septem-
ber 25, 2009 Opinion and Order.

Prime Time twice deposed Yast on November 2 and 24, 2009.
During the first deposition, Prime Time inquired about Yast's
duties as General Counsel at DirectBuy, his role and the extent
of his participation in the termination of Prime Time's franchise
and the audit/investigation that led to the decision to terminate
the franchise, and his knowledge of a prior audit of Prime Time
that DirectBuy conducted in 2004.  Prime Time contends that the
2004 audit supports its affirmative defense of laches by provid-
ing evidence that DirectBuy knew of Prime Time's business with
Home Improvement, yet it allowed Prime Time to continue using
Home Improvement as a supplier.  In response to many of these

questions, Yast provided evasive and incomplete responses or avoided answering by claiming he did not understand the questions posed. For example, Yast would not describe his general duties:

> Q: And what were your general duties from 1997 on? While you were still the attorney hired to represent DirectBuy?
>
> A: I don't understand your question
>
> (First Deposition of C. Joseph Yast, Ex. A to Deft. Mot. to Compel Dep. at p. 6)

After several questions regarding Yast's duties during the time period when he was working for DirectBuy as an outside counsel, Yast continued to avoid answering questions by stating he did not understand the questions being posed or the time period for which the question were covering, despite the fact that Prime Time clearly had established the relevant time period in question:

> Q: Did you have any duties in connection with the termination of any franchises during that period of time?
>
> A: What period of time?
>
> Q: The period of time that we defined as January, 2004 through January of 2007.
> A: And your question is, did I have any duties with regard to what?
>
> Q: Termination of any franchisee.
>
> A: I'm not understanding your question Mr. Matthews, I'm sorry . . .

> Q: I'm asking, did you have any duties
>    in connection with the termination
>    of any franchise during that pe-
>    riod?
>
> A: What do you mean by "duties"?
>
> Q: Responsibilities, involvement.
>
> A: I just — I'm sorry, but I'm not
>    understanding your question.
>
> (First Yast Dep., Ex. A to Deft. Mot. to
> Compel Dep. at pp. 8-9)

When questioned about his involvement with the termination of Prime Time's franchise for which Yast wrote the termination letter and any meetings leading up to the termination, Yast continued to evade any questions through a series of evasive responses:

> Q: Who told you to terminate the fran-
>    chise?
>
> A: I don't remember who told me to
>    terminate the franchise, if anyone
>    told me to terminate the franchise.
>
> Q: Your answer indicates that it's
>    within the degree of reasonable
>    probability that no one told you to
>    terminate the franchise?
>
> A: No, that's not correct.
>
>                    * * *
>
> Q: Well you were either told by someone
>    else to terminate the franchise or
>    you weren't.

A:   I don't agree that those are the only two alternatives in the universe.

Q:   Well, what are the other alternatives?

A:   That there was a meeting where the misconduct engaged in by Mr. Craaybeek was discussed and those at the meeting collectively determined that franchise termination was unfortunately the only alternative to deal with this magnitude of misconduct.

Q:   And when was that meeting?

A:   Sometime before May 11, 2007.

Q:   How long before May 11th?

A:   I don't remember how long.

                    * * *

Q:   Who was present in that meeting?

A:   Officers.

Q:   What were their names?

A:   I'm not sure there was just one meeting.

Q:   You described earlier moments ago a meeting at which you recalled there was a consensus to terminate Mr. Craaybeek.

A:   No, I didn't

                    * * *

Q:   Well, then you tell me how it occurred.

> A: I gave you another alternative which you're now trying to say is documentary proof of something happened which I, which I didn't say happened.

(First Yast Dep. at pp. 16-18)

Further, when asked about the location of Prime Time's franchise file which Yast admitted to having and possibly using in the preparation of the letter terminating Prime Time's franchise, Yast continued to provide evasive responses as to the location or whereabouts of the file:

> Q: Where was that file maintained?
>
> A: On May 11, 2007? It was in my office.
>
> Q: Where is it prior to when it was in your office? Where did you get it?
>
> A: From the Franchise Development Department.
>
> Q: And who is the head of the Franchise Development Department?
>
> A: Debbie Brown.
>
> Q: So that file was maintained in Debbie Brown's office —
>
> A: No.
>
>             * * *
>
> Q: Well, where was it?
>
> A: I don't remember exactly where it was. It was in storage. . . .

Yes, it was stored in filing cabi-
nets.

Q:   So it was in a filing cabinet in,
     within her department.  Is that
     what you're saying?

A:   It was in a filing cabinet within
     our corporate office.

(First Yast Dep. at pp. 44-46)

Additionally, Prime Time asked Yast about the circumstances under

which several former employees who were involved with the 2004

audit of Prime Time left DirectBuy.  However, Yast refused to

answer these questions, arguing that they were not relevant to

any claims or defenses in this case.

Prime Time conducted the second deposition of Yast on

November 24, 2009, during which it asked several questions about

DirectBuy's policies regarding franchisees' use of local suppli-

ers and DirectBuy's policies for conducting audits.  During this

deposition, Yast admitted that DirectBuy in fact did have written

policies in place that dealt with the use of local vendors by

DirectBuy's franchisees.  However, Yast provided vague answers to

the questions regarding audit procedures by arguing the differ-

ence between policies and "customs and practices."  (Second Yast

Dep., Ex. A. at p. 17)

Prime Time also conducted a deposition of Fred Graessle, the

current Director of Audit at DirectBuy and the owner of Integrity

Assurance, on November 24, 2010. Prior to becoming an employee, DirectBuy hired Graessle's Integrity Assurance to conduct the 2007 audit of Prime Time which led to the termination of Prime Time's franchise with DirectBuy. Graessle testified to his estimates of the damages that DirectBuy is claiming. Graessle also testified that he created a personal computer file regarding his 2007 audit of Prime Time which he used to create the audit report that he gave to DirectBuy. He also testified that he did not produce that file to DirectBuy or to Prime Time during discovery for this litigation. When asked where the file was located, he testified that it was located at DirectBuy.

Following the depositions, Prime Time submitted a formal request to DirectBuy for the production of documents containing the written policies of DirectBuy regarding the approval of local vendors, documents relating to unapproved local vendors used by all DirectBuy franchises from 2001 through 2007, documents relating to conducting audits and preparing audit reports from 2004 through the present, documents showing the selling prices of all DirectBuy franchises from 2004 through the present, Graessle's file relating to the 2007 audit of Prime Time, and documents relating to an appraisal of Prime Time by Scott Stout, for which DirectBuy had paid. Prime Time states that many of these documents had been requested in its First set of Interrogatories

served on May 23, 2008, and that DirectBuy had failed to provide those documents.  Prime Time also argues that the requested information regarding Graessle's audit file and DirectBuy's written policies for the use of unapproved local vendors first was ascertained during the depositions on November 24, 2010, or because of evidence that was produced at the end of the discovery period, and therefore Prime Time's request for these documents on the last day of discovery was proper and timely.

In addition, DirectBuy executive, Donna Vaughan, testified in her deposition that DirectBuy's TOPS information system stores information about all local and national vendors used by any DirectBuy franchisee and that DirectBuy could use this system to produce a comprehensive list of all local vendors with whom it allowed its franchises to conduct business, rather than producing 400 irrelevant Application & Agreements.

DirectBuy responded to Prime Time's November 24, 2010 requests for documents in a letter dated December 4, 2010.  In that letter, DirectBuy argued that it had produced all of the previously requested documents that were not privileged and that the remaining requests for documents were untimely because they were submitted on the last day of the extended discovery period. Moreover, DirectBuy argued that Prime Time's request for Graessle's 2007 audit file was inappropriate because the document was

not in the possession or custody of DirectBuy and that it was the property of Graessle and Integrity Assurance. Although the parties exchanged several letters and emails in regards to the requested discovery, they were unable to resolve this discovery dispute.

Prime Time filed its Second Motion to Compel Discovery on February 17, 2010, requesting an order compelling the production of documents relating to the approval of local vendors, an order compelling the production of documents provided to and/or received from Stout relating to the appraisal of Prime Time, an order compelling the production of documents reflecting the purchase price of DirectBuy franchises sold over the past five (5) years, an order compelling DirectBuy to produce Fred Graessle's file relating to his audit of Prime Time, and an order awarding attorneys fees related to DirectBuy's failure to produce discovery. Prime Time also filed a Motion for Sanctions requesting that the court dismiss DirectBuy's action with prejudice or find that DirectBuy knew that its franchisees conducted business with local vendors without prior approval since 2004. Finally, Prime Time also filed a motion to compel Yast to submit to another deposition and to provide complete answers.

Although DirectBuy claimed that it did not have any documentation regarding an appraisal of Prime Time by Stout, DirectBuy's

Franchise Relations Manager, Nathan Press, located Stout through an internet search on March 16, 2010, and called him to obtain a copy of the requested appraisal. Stout provided DirectBuy with a copy of the appraisal, along with an invoice for $50.00. On March 18, 2010, DirectBuy contacted Prime Time about the Stout appraisal and offered to provide the document to Prime Time in exchange for reimbursement of the $50.00 that DirectBuy paid to obtain the document. Prime Time refused to reimburse DirectBuy for the $50.00 charge incurred in obtaining a copy of the appraisal from Stout. Further, DirectBuy asserts that due to the ease of which it was able to locate Stout and obtain a copy of the appraisal through an internet search, Prime Time's request for this document demonstrates its failure to conduct simple third party discovery to obtain the document for itself.

## Discussion

A party may "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things." Federal Rule of Civil Procedure 26(b)(1). For discovery purposes, relevance is construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the

case." Chavez v. DaimlerChrysler Corp., 206 F.R.D. 615, 619 (S.D. Ind. 2002)(quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.E.2d 253 (1978)). Even when information is not directly related to the claims or defenses identified in the pleadings, the information still may be relevant to the broader subject matter at hand and meet the rule's good cause standard. Borom v. Town of Merrillville, 2009 WL 1617085, *1 (N.D. Ind. June 8, 2009) (citing Sanyo Laser Prods., Inc. v. Arista Records, Inc., 214 F.R.D. 496, 502 (S.D. Ind. 2003)). See also Adams v. Target, 2001 WL 987853, *1 (S.D. Ind. July 30, 2001) ("For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."); Shapo v. Engle, 2001 WL 629303, *2 (N.D. Ill. May 25, 2001) ("Discovery is a search for the truth.").

A party may seek an order to compel discovery when an opposing party fails to respond to discovery requests or has provided evasive or incomplete responses. Federal Rule of Civil Procedure 37(a)(2)-(3). The burden "rests upon the objecting party to show why a particular discovery request is improper." Gregg v. Local 305 IBEW, 2009 WL 1325103, *8 (N.D. Ind. May 13, 2009) (citing Kodish v. Oakbrook Terrace Fire Protection Dist., 235 F.R.D. 447, 449-50 (N.D. Ill. 2006)); McGrath v. Everest National Insurance Co., 2009 WL 1325405, *3 (N.D. Ind. May 13, 2009) (internal

17

citations omitted); Carlson Restaurants Worldwide, Inc. v. Hammond Professional Cleaning Services, 2009 WL 692224, *5 (N.D. Ind. March 12, 2009) (internal citations omitted).  The objecting party must show with specificity that the request is improper. Cunningham v. Smithkline Beecham, 206 F.R.D. 474, 478 (N.D. Ind. 2009) (citing Graham v. Casey's General Stores, 206 F.R.D. 253, 254 (S.D. Ind. 2002)).  That burden cannot be met by "a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."  Cunningham, 255 F.R.D. at 478 (citing Burkybile v. Mitsubishi Motors Corp., 2006 WL 2325506, *6 (N.D. Ill. Aug. 2, 2006)) (internal quotations and citations omitted).  Rather, the court, under its broad discretion, considers "the totality of the circumstances, weighing the value of material sought against the burden of providing it, and taking into account society's interest in furthering the truth-seeking function in the particular case before the court."  Berning v. UAW Local 2209, 242 F.R.D. 510, 512 (N.D. Ind. 2007) (examining Patterson v. Avery Dennison Corp., 281 F.3d 676, 681 (7th Cir. 2002)) (internal quotations and citations omitted).

Prime Time's Second Motion to Compel Discovery requests an order compelling DirectBuy to produce documents in response to Prime Time's November 24, 2009 letter to DirectBuy. Prime Time requests the production of (1) all documents containing Direct-Buy's policies relating to the approval of local vendors, (2) all documents to/from Stout relating to the appraisal of Prime Time, (3) all documents reflecting the purchase price of DirectBuy franchises sold over the past five years, and (4) Fred Graessle's file relating to his audit of Prime Time. Prime Time also requests an order awarding attorney fees. Prime Time contends that it is entitled to these documents because they are relevant to the issue of damages and Prime Time's defense of laches. Prime Time also insists the requests were timely.

Federal Rule of Civil Procedure 16(b) provides that a schedule shall not be modified except upon a showing of good cause and by leave of the court. Campania Management Co., Inc. v. Rooks, Pitts & Poust, 290 F.3d 843, 851 (7th Cir. 2002); Brie-sacher v. AMG Resources, Inc., 2005 WL 2105908, *2 (N.D. Ind. Aug. 31, 2005). Good cause sufficient for altering discovery deadlines is demonstrated when a party shows that, "despite their diligence, the established timetable could not be met." Tschantz v. McCann, 160 F.R.D. 568, 571 (N.D. Ind. 1995). Generally, the discovery deadline specifies the date on which all discovery must

be completed, therefore, any document requests must be served at least 30 days prior to the discovery deadline. See Shadle v. First Financial Bank, N.A, 2009 WL 3787006, *1 (N.D. Ind. Nov. 10, 2009) (discussing Rules 16, 33, and 34, and Local Rule 16.1(d)(5)). However, courts have allowed discovery requests that would require responses after the close of discovery in certain circumstances. See International Truck and Engine Corp. v. Caterpillar, Inc., 2004 WL 3217760, *1-2 (N.D. Ind. May 26, 2004) (allowing supplemental responses to interrogatories served two days before the fact discovery deadline, because the late supplementation was harmless, trial was several months away, and any prejudice suffered by the defendant could be easily remedied by a motion to reopen fact discovery); Kedzior v. Talman Home Federal Savings & Loan Association of Illinois, 1990 WL 70855, *5 (N.D. Ill. May 10, 1990) (granting plaintiff's motion to compel documents "for all job openings since 1986" when the defendant revealed a company policy five days before the discovery deadline that had excluded certain jobs from its previous discovery responses). The court finds that Prime Time has demonstrated good cause to modify the scheduling order and to allow the late document requests.

In its first request, Prime Time is seeking an order compelling DirectBuy to produce all documents containing DirectBuy's

policies relating to the approval of local vendors.  Although
DirectBuy argues that the last-day discovery request is untimely
because Prime Time failed to make any prior requests for these
policies in its modified Document Request No. 16, Prime Time's
failure to make timely requests for this information was the
result of DirectBuy's intentional attempts to avoid discovery in
this matter.

Prime Time finally learned about these policies at the end
of the extended discovery period and promptly used this informa-
tion during Yast's second deposition, held on the last day of
discovery, to question Yast about the existence of any DirectBuy
policies relating to the approval of local vendors.  Yast admit-
ted that DirectBuy initiated local vendor policies in either 2007
or 2008, and later that afternoon Prime Time served DirectBuy
with a formal request for any documents relating to those poli-
cies.  Prime Time's diligent efforts to discover relevant infor-
mation regarding DirectBuy's knowledge of local vendor relation-
ships with its franchisees and Prime Time's prompt document
request after learning of DirectBuy's local vendor approval
policies strongly suggest that Prime Time would have taken action
much earlier to obtain this material if it had been able to learn
of these relevant policies sooner.  See International Truck and
Engine Corp., 2004 WL 3217760 at *4 (finding an allegation of

untimeliness particularly unpersuasive given that complaining party failed to produce a deposition witness just two days before the fact discovery deadline).

Moreover, DirectBuy's failure to produce a copy of Yast's May 30, 2007 Notice to All DirectBuy Centers was responsible, at least in part, for Prime Time's late request for documents containing DirectBuy's policies relating to the approval of local vendors. Because Yast's 2007 Notice to All DirectBuy Centers identified DirectDepot as an unapproved local vendor with whom DirectBuy had allowed its franchises to conduct business since 2002, DirectBuy should have produced this document in compliance with the September 25, 2009 Opinion and Order compelling the production of documents responsive to Prime Time's modified Document Request No. 16. Instead, DirectBuy withheld this information and claimed that it had produced everything in its possession that was responsive to this request. Therefore, Prime Time's requests for documents relating to DirectBuy's local vendor approval policies is timely. See Kedzior, 1990 WL 70855 at *5 ("[B]ecause defendant's disclosure, five days before the close of discovery, did not give plaintiff ample time to investigate and assess her need for further discovery, we will compel the production of these documents.").

Prime Time's next document request seeks an order compelling the production of Graessle's file relating to the 2007 audit. Prime Time learned of this file during Graessle's deposition on November 24, 2009, when Graessle testified that he had a file relating to the 2007 audit which had not been produced previously during discovery. When Prime asked where the file was located, Graessle responded, "At DirectBuy." (Graessle Dep., Ex. M to Deft. Mot. to Compel Disc. p. 20) Prime Time served DirectBuy with a formal request for Graessle's file that afternoon. DirectBuy responded with two objections to this request on December 4, 2009 — that Prime Time's last minute request was untimely and that DirectBuy could not produce the file because Graessle in his capacity as owner of Integrity Assurance had sole possession, custody, or control over the file.

Just as Prime Time's request for DirectBuy's local vendor policies, DirectBuy's objection of untimeliness also fails. Because DirectBuy withheld mention of Graessle's audit file for 17 months before disclosing the file's existence on the day of the extended discovery deadline, Prime Time's November 24, 2009 request for the file was not untimely.

DirectBuy also argues that although Graessle has kept the file in his DirectBuy office, the requested file remains within the sole custody and possession of Graessle in his capacity as

the owner of Integrity Assurance and that Prime Time should have subpoenaed Graessle and Integrity Assurance during the discovery period in order to obtain the file.  Although DirectBuy is correct that the proper vehicle for third-party discovery is the use of a subpoena, DirectBuy failed to identify Graessle and Integrity Assurance as the parties possessing the audit file until after discovery had closed.  Further, Graessle's own deposition testimony that the audit file was located "At DirectBuy" suggests DirectBuy's possession and control over the file. Because DirectBuy withheld information regarding Graessle's file until the last day of discovery and then misrepresented the party in possession of the file until after the discovery deadline, the court will grant Prime Time's request.  See Kedzior, 1990 WL 70855 at *5 ("We find that defendant's misrepresentation, intentional or otherwise, constitutes sufficient cause to reopen discovery for the purpose of compelling the documents that plaintiff requests").

Similarly, DirectBuy's objection that Prime Time's request for documents relating to DirectBuy's processes for conducting audits and preparing audit reports is untimely fails.  Despite DirectBuy's argument that Prime Time never included these in its prior discovery requests, the court finds that audit processes are responsive to Prime Time's Document Request No. 15, which

seeks the production of "[a]ll documents and communications that refer or relate to any audit or financial review, or the preparation for any audit or financial review, of Prime Time . . . by DirectBuy . . . ." (Deft. Doc. Req. No. 15, Ex. A to Deft. Mot. to Compel Disc. p. 7) (emphasis added). Any documents containing DirectBuy's general practices and procedures regarding audits and the preparation of audit reports that would have governed the decisions to audit Prime Time in 2004 and 2007, the preparation of the 2004 and 2007 audit reports, and the dissemination of the audit's results throughout DirectBuy would be relevant to the audit of Prime Time. Furthermore, this information is relevant because it could show that DirectBuy knew of Prime Time's relationship with Home Improvement since 2004 but chose to sit on its rights for over two years.

Prime Time's next request seeks an order compelling the production of documents reflecting the purchase price of Direct-Buy franchises sold over the past five years. On November 4, 2009, Prime Time served DirectBuy with a Federal Rule of Civil Procedure 30(b)(6) Notice of Deposition, which was scheduled to take place on November 24, 2009. Prime Time included the issue of the purchase prices for DirectBuy franchises sold over the last five years as a matter for examination in the Rule 30(b)(6) Notice of Deposition. However, during the Rule 30(b)(6) deposi-

tion of Yast on November 24, 2009, DirectBuy objected to this topic and refused to offer any witnesses to testify about the requested purchase price of DirectBuy franchises. Following the Rule 30(b)(6) deposition, Prime Time served DirectBuy with a request for the production of documents reflecting these purchase prices. DirectBuy objects to this late request as untimely on the grounds that, with the exception of Prime Time's Rule 30(b)(6) Notice of Deposition, Prime Time never made any earlier requests for these documents, and Prime Time's Rule 30(b)(6) deposition notice did not constitute a formal request because Prime Time did not supplement the deposition notice with a Rule 34 document request as required by Rule 30(b)(2).

Once again, the court finds that DirectBuy's objection has no merit when any late requests were caused by DirectBuy's refusal to comply with Prime Time's Rule 30(b)(6) Notice of Deposition.

> Rule 30(b)(6) allows a party to depose a
> corporation by serving a notice and subpoena
> naming the corporation as a deponent and
> describing "with reasonable particularity the
> matters on which examination is requested."
> The named corporation must then designate one
> or more individuals to testify on those mat-
> ters. Fed. R. Civ. P. 30(b)(6). If the
> corporation fails to make a designation or a
> designated individual fails to answer a ques-
> tion, the deposing party may move for an
> order compelling a designation or answer.
> Fed. R. Civ. P. 37 (a)(2)(B). If the corpo-
> ration believes the discovery sought is ob-

> jectionable, it still must comply with the
> discovery, unless it has a pending Rule 26(c)
> motion for a protective order.  Fed. R. Civ.
> P. 37(d); Bregman v. Dist. of Columbia, 182
> F.R.D. 352, 355 (D.D.C. 1998) ("Confronted
> with a notice of deposition (or any other
> type of discovery) a party must either comply
> with the discovery demand or seek a protec-
> tive order . . .").
>
> International Truck and Engine Corp., 2004 WL
> 3217760 at *3

First, DirectBuy's argument that Prime Time's request for docu-
ments reflecting the requested purchase prices of DirectBuy
franchises is untimely clearly fails.  Prime Time served Direct-
Buy with its requests for documents reflecting the purchase price
of DirectBuy franchises just a few hours after DirectBuy failed
to produce witnesses to testify about the requested prices.
Therefore, Prime Time's document requests made at the discovery
deadline were not untimely.  See Id. at *4 ("Further, defendant's
allegation of untimeliness is particularly unpersuasive given
that the primary discovery failure of which plaintiff complains
(the failure to produce witnesses at deposition) occurred only
two days before the fact discovery deadline.").

Although Prime Time did not include a Rule 34 request with
its Rule 30(b)(6) deposition notice, the court finds that allow-
ing Prime Time's late document request is proper in this situa-
tion due to DirectBuy's last minute failure to comply with the
Rule 30(b)(6) Notice of Deposition.  See generally Rule

27

37(a)(3)(B)(ii).  However, since DirectBuy failed to designate an individual to testify about the purchase price of DirectBuy franchises on the last day of discovery, granting Prime Time's motion to compel the production of documents which reflect those purchase prices will prove more efficient than requiring Direct-Buy to make such a designation, and then extending the discovery deadline to require another Rule 30(b)(6) deposition.

Finally, Prime Time requests an order compelling the production of all documents involving the Stout appraisal of Prime Time.  Despite DirectBuy's claims that it did not possess the appraisal, DirectBuy ordered the appraisal of Prime Time and paid Stout to conduct it, so it was reasonable for Prime Time to assume that DirectBuy would maintain those records.  In addition, although DirectBuy argues that Prime Time should have obtained this information through a timely third party subpoena, DirectBuy neither identified Stout as a party in possession of the requested appraisal nor provided Prime Time with any information that would be useful in locating Stout during the discovery period.

Although DirectBuy did locate Stout, obtained a copy of the appraisal, and offered it to Prime Time, it remains unclear why DirectBuy waited nearly four months after the close of discovery before attempting to locate this information.  Prime Time is

entitled to discovery of the Stout appraisal obtained by Direct-Buy on March 16, 2010.  See, e.g., International Truck and Engine Corp., 2004 WL 3217760 at *2 ("[Defendant]'s cries of prejudice from [plaintiff]'s New Claims and Products are not believable in the face of its simultaneous attempt to add a brand-new defense."); Kedzior, 1990 WL 70855 at *5 ("We find that defendant's misrepresentation, intentional or otherwise, constitutes sufficient cause to reopen discovery for the purpose of compelling the documents that plaintiff requests.").

For the foregoing reasons, the court finds that Prime Time's document requests on November 24, 2009, were proper in light of the circumstances in this case.  Therefore, Prime Time's Second Motion to Compel Discovery is GRANTED.  DirectBuy is ORDERED to produce the requested documents within TWENTY-EIGHT (28) DAYS of this ruling.

Prime Time also requests an order awarding attorney fees related to DirectBuy's failure to produce discovery in relation to this motion.  "The great operative principle of Rule 37(a)(4) is that the loser pays."  Charles Alan Wright & Arthur R. Miller, 8 Federal Practice and Procedure §2288 at 787 (1970).  "Fee shifting when the judge must rule on discovery disputes encourages their voluntary resolution and curtails the ability of litigants to use legal processes to heap detriments on adversar-

ies (or third parties) without regard to the merits of the claims." Rickels v. City of South Bend, Ind., 33 F.3d 785, 787 (7th Cir. 1994). Any loser may avoid payment by showing that his position was substantially justified. Rickels, 33 F.3d at 787. The failure to disclose is sanctionable and properly remedied by an order compelling discovery. Rule 37(a)(2)(B), (a)(3), and (a)(4); Lucas v. GC Services, L.P., 226 F.R.D. 328, 329-30 (N.D. Ind. 2004). Rule 37(a)(4)(A) states that the court shall require sanctions based upon the costs of seeking a motion to compel. Stookey v. Teller Training Distributors, Inc., 9 F.3d 631, 637 (7th Cir. 1993)("Rule 37(a)(4) clearly allows for an award of the expenses incurred in obtaining an order to compel, including attorney's fees."). Under Rule 37(a)(4)(A), sanctions are appropriate unless the party's nondisclosure was "substantially justified." In addition, Rule 37(c)(1) states that a party who fails to disclose, provides false or misleading disclosure, or refuses to admit information required by Rule 26(a) without "substantial justification" may be sanctioned unless such failure was "harmless." Musser v. Gentiva Health Services, 356 F.3d 751, 755 (7th Cir. 2004); Salgado v. General Motors Corp., 150 F.3d 735, 742 (7th Cir. 1998); Engel v. Town of Roseland, 2007 WL 2903196, *6 (N.D. Ind. Oct. 10, 2007). Thus, Rule 37(a)

is a fee-shifting rule, and the loser must pay unless it demonstrates that its position was "substantially justified."

This court's September 25, 2009 Opinion and Order noted DirectBuy's previous conduct, which included waiting several months before providing answers to interrogatories and failing to produce documents and answers to interrogatories that DirectBuy had promised until after it was faced with Prime Time's First Motion to Compel Discovery. The September 25, 2009 Opinion and Order also warned both parties that "any subsequent discovery motions will include court imposed attorney's fees." (Opinion & Order [DE 172] p. 15) Despite the court's prior warning, DirectBuy has continued to withhold relevant information until the last possible minute for apparently no other reason than to prevent Prime Time from having time to review the information and make additional requests before the discovery deadline. In light of DirectBuy's pattern of similar behavior throughout the discovery process, this court does not find DirectBuy's objections to this motion to be justified. Therefore, Prime Time's request for attorney fees is GRANTED. Counsel for Prime Time shall submit an affidavit in support of all relevant attorney's fees relating to this Second Motion to Compel within seven (7) days.

The second motion before the Court is Prime Time's Motion to Compel DirectBuy's General Counsel, C. Joseph Yast, to Submit to

a Deposition and Provide Complete Answers in Accordance with Rule 37(a)(3)(B)(i).  Rule 30(a)(1) governs depositions by oral examination: "A party may, by oral questions, depose any person, including any party, without leave of court except as provided by Rule 30(a)(2)."  Although Rule 30 allows objections by counsel during the deposition, "An objection at the time of the examination . . . must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection."

The failure to disclose, which includes providing evasive or incomplete answers, is properly remedied by an order compelling discovery.  Rule 37(a)(2)(B), (a)(3), and (a)(4); Lucas, 226 F.R.D. at 329-30.  The court has broad discretion when reviewing a discovery dispute and "should independently determine the proper course of discovery based upon the arguments of the parties."  Gile v. United Airlines, Inc., 95 F.3d 492, 496 (7th Cir. 1996).  See also Gehring v. Case Corp., 43 F.3d 340, 342 (7th Cir. 1994) ("District judges have substantial discretion to make such decisions to curtail the expense and intrusiveness of discovery and trial"); Perry v. Kelly-Springfield Tire Co., 117 F.R.D. 425, 426 (N.D. Ind. Oct. 21, 1987) ("Like most discovery disputes, the availability of a second deposition is left to the discretion of the trial court.  The party opposing the deposition must demonstrate 'good cause' for a protective order.").  The

burden to show why a particular discovery request is improper rests upon the objecting party.  Meyer v. Southern Pacific Lines, 199 F.R.D. 610, 612 (N.D. Ill. 2001).

"If the motion is granted . . . the court must, after giving an opportunity to be heard, require the party of deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."  Rule 37(a)(5)(A).  Additionally, Rule 30(d)(2), which governs the conduct of parties, counsel, and deponents at depositions, states, "If a person's conduct is so egregious that it 'impedes, delays, or frustrates the fair examination of the deponent,' the Court may impose 'additional appropriate sanction' on that person, 'including the reasonable expenses and attorney's fees incurred by any party.'"  GMAC Bank v. HTFC Corp., 248 F.R.D. 182, 184 (E.D. Penn. Feb. 29, 2008) (discussing Rule 30(d)(2)).

In support of this motion, Prime Time contends that Yast has delayed the discovery process by providing evasive responses, claiming he did not understand simple questions, and refusing to answer several questions altogether.  DirectBuy raises two objections to an order compelling another deposition of Yast. First, although Yast had to ask for clarification to many ques-tions, he provided complete answers to all of Prime Time's rele-

vant questions.  Second, Yast was justified in his refusal to answer questions regarding "sensitive information" about former employees.

DirectBuy's first objection fails because the deposition clearly demonstrates that Yast failed to provide complete and responsive answers to many of Prime Time's questions.  Yast evaded questions regarding his role in the termination of Prime Time's franchise, his duties as DirectBuy's general counsel, and the individuals in charge of the "investigation"/audit that led to the termination of Prime Time's franchise by arguing that he did not understand the questions being posed or the simple terminology used in those questions.  Similarly, when asked about DirectBuy's decision to terminate Prime Time's franchise, Yast maintained that he did not know whether anyone told him to terminate Prime Time's franchise relationship, whether it was possible he made the decision himself, or whether the decision was the result of a consensus of unknown DirectBuy officers during one, two, or an indefinite number of meetings at DirectBuy.  There were many other times throughout the deposition where his responses seemed to do little more than offer a myriad of uncertainties and possibilities while providing very few answers.

Similarly, when Prime Time asked Yast about the location of Prime Time's franchise file that he used when preparing Prime

Time's termination letter, Yast responded that the file was "in a file cabinet in our corporate office." (First Yast Dep. at p. 46) Yast's deposition testimony demonstrates that he intentionally avoided and frustrated the deposition process through his incomplete, evasive, or "unsure" responses. See GMAC Bank, 248 F.R.D. at 186 (granting plaintiff's motion to compel after defendant engaged in "three types of inappropriate conduct during two prior depositions: (1) engaging in hostile, uncivil, and vulgar conduct; (2) impeding, delaying, and frustrating fair examination; and (3) failing to answer and providing intentionally evasive answers to deposition questions."). See also Perry, 117 F.R.D. at 426 (holding that a defendant added after the date of the plaintiff's initial deposition could subject the plaintiff to a second deposition, but limiting the plaintiff's second deposition to only those areas not covered in the first deposition.).

In their second objection to this motion, DirectBuy argues that Yast was justified in his refusal to answer Prime Time's questions regarding the circumstances of former DirectBuy employees' departure from DirectBuy in 2008 and 2009. DirectBuy argues that the circumstances surrounding the departure of these non-party former employees from DirectBuy are not relevant to any claims or defenses in this case and are the types of sensitive personal information that justifies a party's good faith refusal

to answer.  DirectBuy cites Gehring, 43 F.3d at 342; Twigg v.
Pilgrim's Pride Corporation, 2007 U.S. Dis. LEXIS 14669 (N.D.
W.V. 2007); and Mendenhall v. American Booksellers Ass'n., 1990
WL 422415 (S.D.N.Y. May 1, 1990), in support of this contention.
However, the case at hand is clearly distinguishable from each of
the cases relied upon by DirectBuy.

Unlike the ADEA claim in Gehring, where the district judge
conducted an in camera review of the requested personnel files,
this court has not made any findings of sensitive information
regarding the employee files that Prime Time requested.  Gehring,
43 F.3d at 342.  Rather, it seems that DirectBuy has assumed that
the questions posed by Prime Time are impermissible solely be-
cause they relate to the status of former DirectBuy employees.

Although courts "unanimously agree non-party employees in a
case have significant interests in avoiding disclosure of their
personal information, . . . [c]ases considering a privilege based
on employee privacy involve discovery requests seeking signifi-
cant amounts of information from employee personnel files."
Twigg, 2007 WL 676208 at *14-15.  Unlike Twigg, Prime Time only
has requested a limited amount of information regarding the cir-
cumstances surrounding the departure of those employees from
DirectBuy whose names appeared on the 2004 audit report of Prime
Time.  Under the broad relevancy standard of discovery, Prime

Time's questions are relevant because the information sought could reveal that these employees were terminated in relation to this case or a similar franchise agreement. It also could lead to evidence to support Prime Time's defense of laches by showing that DirectBuy knew of the nature of Prime Time's relationship with Home Improvement since 2004, yet chose not to act. See Id. (holding that interrogatories seeking non-party employees' names, addresses, phone numbers, job accommodations (or lack thereof), and reasons for accommodations (or lack thereof) were only a de minimus invasion of privacy that is not contemplated in the privacy privilege). See also Mendenhall, 1990 WL 422415 at *2 ("[I]t is perfectly appropriate for counsel to explore the circumstances of [an employee's] resignation to determine whether it related to the [allegations] in the complaint.").

As a result of Yast's numerous evasive and incomplete answers, as well as his refusal to answer relevant questions regarding the circumstances of former employees' departure from DirectBuy since the 2004 audit of Prime Time took place, Prime Time's Motion to Compel Yast to Submit to Deposition and Provide Complete Answers in Accordance with Rule 37(a)(3)(B)(i) is GRANTED. As such, Yast is ORDERED to submit to another deposition within TWENTY-EIGHT (28) DAYS.

Because Prime Time's motion to compel Yast to submit to another deposition is granted and it is clear that Yast's and DirectBuy's intentionally evasive conduct necessitated this motion, DirectBuy is ORDERED to pay Prime Time's reasonable expenses and attorney's fees incurred by this motion as well. Counsel for Prime Time is DIRECTED to submit an affidavit in support of his relevant attorney fees and costs within seven (7) days.  In addition, since Yast's conduct during the two prior depositions clearly frustrated and delayed the fair examination of Yast, DirectBuy is ORDERED to pay the legal fees and reasonable costs of conducting another deposition of Yast.

The final motion before this court is Prime Time's Motion for Sanctions.  Prime Time requests that the court dismiss DirectBuy's action against Prime Time with prejudice or, alternatively, issue an order finding that, for the purposes of this action, it is established that DirectBuy knew that its franchises conducted business with local vendors without prior approval since as early as 2002, and with Home Improvement since 2004.

Under Rule 37, a district court may impose sanctions upon a party who violates an order directing discovery.  Moore v. Doe, 108 F.3d 1379 (7th Cir. 1997).  When a party, a party's officer, or a witness designated under Rule 30(b)(6) or 31(a)(4) fails to obey a discovery order, the district court may impose sanctions,

including "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims," and "dismissing the action or proceeding in whole or in part."  Rule  37(b)(2)(A)(i) and (A)(v).  "An award of sanctions under Rule 37 should effectuate its three purposes: (1) ensuring the disobedient party does not benefit from non-compliance; (2) obtaining compliance with discovery orders; and (3) providing a general deterrent in the particular case and litigation in general."  Woods v. Chicago Transit Authority, 2006 WL 2460618, *2 (N.D. Ill. Aug. 18, 2006) (citing National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 96 S.Ct. 2780 (1976).  "While the court has broad discretion to fashion an appropriate sanction, it must be proportionate to the circumstances surrounding a failure to comply with discovery."  Haynes v. Dart, 2010 WL 140387, *3 (N.D. Ill. Jan. 11, 2010) (citing National Hockey League, 427 U.S. at 642-43, 96 S.Ct. at 2780-81) (internal citations omitted).  There are two limitations upon a court's discretion to impose sanctions under Rule 37(b)(2): the sanctions must be "just" and they must "relate to the particular claims to which the discovery order was addressed."  Morris v. United States, 37 Fed. Cl. 207, 213 (1997) (citing Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 707, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982).

"Of all possible sanctions, dismissal is considered 'draco-nian,' and dismissal is appropriate only where the noncompliance is due to willfulness, bad faith, fault or gross negligence rather than inability to comply or mere oversight."  Woods, 2006 WL 2460618 at *2 (citing Marrocco v. General Motors Corp., 966 F.2d 220, 223-24 (7th Cir. 1992)).  See also Ridge Chrysler Jeep, LLC v. Daimlerchrysler Financial Services Americas, LLC, 516 F.3d 623, 626-27 (7th Cir.2008) (upholding dismissal as sanction when "plaintiffs have behaved like a pack of weasels."); Rice v. City of Chicago, 333 F.3d 780, 784 (7th Cir. 2003) ("The drastic nature of a dismissal with prejudice requires the action to be used only in extreme situations, when there is a clear record of delay or contumacious conduct, or when other less drastic sanc-tions have proven unavailable."); Morris, 37 Fed. Cl. at 213 ("[S]trong sanctions, such as issuing an order granting a claim and precluding a party from presenting evidence in opposition to it, should be imposed only for serious violations of discovery orders.").  When considering whether to dismiss an action as a sanction under Rule 37, the court should consider: "(1) the willfulness of the non-compliant party, bad faith, or fault; (2) the efficacy of lesser sanctions; (3) the prejudice to the other party; (4) the duration of the period of noncompliance, and (5)

whether the non-compliant party had been warned of the conse-
quences of his non-compliance." Woods, 2006 WL 2460618 at *3.

Although DirectBuy's conduct during the discovery period has
been inexcusable, the court will not dismiss DirectBuy's action
against Prime Time, because lesser sanctions could prove equally
effective in ensuring DirectBuy's compliance and deterring future
misconduct. Therefore, Prime Time's request that the court
dismiss DirectBuy's action with prejudice is DENIED.

Alternatively, Prime Time requests that the court enter an
order under Rule 37(b)(2)(A) finding that, "for the purposes of
this action, it is established that DirectBuy knew that its
franchisees conducted business with local vendors without ap-
proval since as early as 2002, and with Home Improvement since
2004." (Prime Time Mot. for Sanctions, at p. 1) The courts have
used two different tests for determining whether deeming certain
facts to be established is an appropriate sanction. If the
sanction being requested is not the equivalent to a default
judgment, then the court should apply the balancing test articu-
lated in Chilcutt v. United States, 4 F.3d 1313, 1320-21 (5th
Cir. 1993); In re Lands End Leasing, Inc. v. Blue Mack Transport,
Inc., 220 B.R. 226, 231 (D.N.J. 1998). Because an order deeming
the requested facts to be established in this case only would
establish the first prong of Prime Time's defense of laches and

would not be the equivalent of a default judgment, the court will apply the Chilcutt balancing test. The court must consider the following factors: "(1) culpability (including willfulness and bad faith, and whether the client was responsible or solely the attorney); (2) prejudice; and (3) whether lesser sanctions would have been effective." In re Lands End Leasing, Inc., 220 B.R. at 231 (discussing the Chilcutt balancing exercise). "Willfulness is not required for deeming that certain facts are established for the purposes of a case unless that sanction is the equivalent of a dismissal or default judgment." Id. at 1323. In cases where deeming certain facts to be established does not equate to a default judgment, this sanction is one of the "least harsh sanctions available to courts under Rule 37(b)." Id. at 1320 ("Indeed, it is only more severe than the granting of expenses and attorney's fees.") (internal citations omitted).

The first factor the court must consider is DirectBuy's culpability in this matter. First, the facts of this case demonstrate that DirectBuy's repeated failure to produce documents pertaining to unapproved local vendors was willful and in bad faith. As addressed above, DirectBuy continuously has withheld information responsive to this court's September 25, 2009 Opinion and Order, DirectBuy has applied its own narrow interpretations to both Prime Time's document requests and this

court's Opinion and Order, and DirectBuy has made false representa-
tions that it has complied with this court's orders and Prime
Time's document requests in an attempt to withhold information
from Prime Time.

Additionally, Prime Time claims in response to the September
25, 2009 Opinion and Order, DirectBuy produced over 400 Applica-
tion & Agreements that DirectBuy knew were not responsive to
Prime Time's modified Document Request No. 16.  Prime Time con-
tends DirectBuy failed to produce any documents identifying
"unapproved local vendors," or local vendors conducting business
with DirectBuy franchisees with DirectBuy's knowledge, without
prior written approval.  Instead, Prime Time argues DirectBuy
only produced 400 Application & Agreements identifying the local
vendors that DirectBuy already had approved or denied.

Further, Prime Time claims that DirectBuy executive, Vaugh-
an, testified in her deposition that DirectBuy's TOPS information
system stores information about all local and national vendors
used by any DirectBuy franchisees, and that DirectBuy could have
used this system to produce a comprehensive list of all local
vendors with whom it allowed its franchisees to conduct business,
rather than producing 400 irrelevant Application & Agreements.
Based on these facts, it seems that DirectBuy's production of 400
approved or disapproved Application & Agreements was another

attempt to avoid the production of unfavorable documents by uni-
laterally narrowing its interpretation of Prime Time's request
and this court's previous order.  DirectBuy's continuous attempts
to avoid its discovery obligations were willful and in bad faith.
See Moore, 108 F.3d at 1379 (finding plaintiff's "repeated pat-
tern of delay and avoidance," including his failure to appear for
a deposition, his failure to respond to interrogatories and
requests for production, and his failure respond to a court order
were "sufficient basis alone from which to infer that his actions
were indeed deliberate and meant to cause frustration"); Woods,
2006 WL 2460618 at *3 (finding that plaintiff acted in bad faith
when he violated the judge's orders to respond to interrogato-
ries, answer questions during his deposition, and remove his
sunglasses at his deposition); Lands End Leasing, Inc., 220 B.R.
at 232 (finding willfulness and bad faith when defendants claimed
they were unable to pay a court-ordered sanction of $4,001.67,
yet offered the plaintiff a settlement of $5,000.00).

Second, DirectBuy is responsible for the continued failure
to produce the requested documents.  DirectBuy knew of its obli-
gation to produce documents identifying unapproved local vendors
in accordance with the September 25, 2009 Opinion and Order, and
it had the capability to comply by using the TOPS system to pro-
duce a comprehensive list of local vendors used by DirectBuy

franchises. Instead, DirectBuy attempted to feign compliance with this court's order by producing incomplete and irrelevant information to Prime Time. See Lands End Leasing, Inc., 220 B.R. at 231 (finding defendants were the cause of the discovery misconduct because they were each aware of the court's order to compel the production of documents and failed to comply with it).

The second factor to consider is whether DirectBuy's non-compliance prejudiced Prime Time. Clearly, DirectBuy's refusal to provide Prime Time with documents identifying unapproved local vendors used by DirectBuy franchisees prejudices Prime Time in its ability to establish its defense of laches. See Woods, 2006 WL 2460618, at *4 ("Plaintiff's self-serving refusal to provide Defendant certain information, including answers to deposition questions and the addresses and phone numbers of witnesses, prejudices CTA in the preparation of a defense."). However, the court does not feel that Prime Time will be prejudiced by a refusal to grant its motion for sanctions in light of the fact that the court is granting Prime Time's current motion to compel DirectBuy to produce the requested documents and ordering that Prime Time be awarded for its attorney's fees associated with that motion.

Finally, the third factor for this court to consider is whether lesser sanctions would be effective. Although the court

warned both parties of sanctions in the September 25, 2009
Opinion and Order, neither party has been subjected to any
sanctions until this decision.  Although DirectBuy's conduct
throughout the discovery process has been sanctionable, charging
DirectBuy for the aforementioned attorney fees and the costs of
conducting another deposition of Yast is punishment enough.  In
light of the two sanctions already being imposed against Direct-
Buy, the court finds that further sanctions are inappropriate at
this time.  Further, the court is hesitant to impose any harsher
sanction than those that already have been ordered in this motion
because the parties did not have prior notice that their miscon-
duct could result in such sanctions.  Now, the parties are given
that notice.

For the foregoing reasons, Prime Time's Motion for Sanctions
is DENIED.  However, as previously noted, DirectBuy's continuous
misconduct clearly has impeded the discovery process in this
case, and it is certainly grounds to impose further sanctions if
it continues.  Therefore, let the parties be WARNED that further
non-compliance with this particular discovery matter may result
in the imposition of harsher sanctions, including the dismissal
of this case.  See Moore, 108 F.3d at 1379 (citing Halas v.
Consumer Services, Inc., 16 F.3d 161, 164-65 (7th Cir. 1994)
("[T]he district court is not required to impose a lesser sanc-

tion either as a warning or as an alternative").  Also, this court takes judicial notice of the consolidated and related actions all filed in the Northern District of Indiana and WARNS the parties that the behavior in one case will be considered in all related actions.

_____

For the foregoing reasons, the Second Motion to Compel Discovery in Accordance with Fed. R. Civ. P. 37 [DE 216] filed by Prime Time Marketing Management, Inc. on February 17, 2010, is GRANTED; the Motion for Sanctions in Accordance with Fed. R. Civ. P. 37 [DE 218] filed by Prime Time on February 17, 2010 is DENIED; and the Motion to Compel DirectBuy's General Counsel, C. Joseph Yast, to Submit to a Deposition and Provide Complete Answers in Accordance with Fed. R. Civ. P. 37(a)(3)(B)(i) [DE 220] filed by Prime Time on March 3, 2010 is GRANTED.

ENTERED this 16th day of November, 2010


                              s/ ANDREW P. RODOVICH
                                United States Magistrate Judge